STATE

v.

Derek BROWN.

No. 97–52–C.A.

Supreme Court of Rhode Island.

Jan. 21, 2000.

---

Lauren Sandler Zurier, Aaron. L. Weisman, Providence, for Plaintiff.

Kelly Monteiro, Paula Rosin, Providence, for Defendant.

Present WEISBERGER, C.J., and LEDERBERG, BOURCIER, FLANDERS, and GOLDBERG, JJ.

## OPINION

GOLDBERG, Justice.

This case comes before us on the appeal of the defendant, Derek Brown, from a judgment of conviction of murder in the first degree after a jury trial in the Providence County Superior Court, following which he was sentenced to a term of life imprisonment. For the following reasons, we deny the appeal and sustain the conviction. A summary of the chilling facts of this gruesome murder are as follows.

### Facts and Procedural History

On August 31, 1994, defendant was indicted along with his co-defendant Bradley Kryla (Kryla) for murder and conspiracy to murder Sherry Roy.[1] The cases were severed for trial.[2]

Late on the night of August 23, 1993, Sherry Roy (Roy) became the victim of a particularly brutal and savage beating. According to the defendant, Kryla administered this beating as the defendant stood nearby and watched. The murder occurred at the Mineral Spring Cemetery in Pawtucket, Rhode Island, at around 10 p.m. At around 8 a.m. the following morning, Roy's partially clad beaten and battered body was discovered in the cemetery with a tombstone lying on top of her crushed skull. John Krolikowski, M.D., the medical examiner who performed the autopsy on Roy's body, testified that there were abrasions or scrapes over a large portion of her left facial area, her shoulders had numerous abrasions both on the right front and right back, there was a bruise and a crescent defect in the area of her left ear, and there were numerous other abrasions covering her entire body. Doctor Krolikowski also testified that Roy had suffered substantial internal damage.

---

1. The conspiracy charge was dismissed prior to trial pursuant to Rule 48(a) of the Superior Court Rules of Criminal Procedure.

2. Kryla was convicted of first-degree murder in a separate trial held in February 1997. His appeal was recently decided by this Court. See State v. Kryla, 742 A.2d 1178 (R.I.1999).

He described her brain and brain stem as having been "pushed into small bits and pieces," the base of her brain had been "obliterated," and the area "where the brain sits was just pried right open so that the fracture defect area went from the top right through into the nasal bone area." Doctor Krolikowski further testified that Roy was still alive when these injuries occurred.

Upon learning that Kryla was being questioned by police, and fearing that Kryla would implicate him, defendant, of his own volition, walked into the Pawtucket Police station and, after being informed of his constitutional rights, gave a videotaped statement concerning his and Kryla's participation in the murder of Roy. He implicated Kryla as the principal assailant in Roy's death. He further stated that on the night of the murder he was on his way to visit Kryla's sister when he met Kryla, that he and Kryla had consumed "a lot" of alcohol and that as a result of this intoxication he was "in his own world." Harold Strobel (Strobel), an acquaintance of Roy, testified at trial that he had spent the day with Roy, and that she had left his house intending to purchase cigarettes at around 10 p.m. Strobel testified that the last time he saw Roy, she was headed in the direction of the cemetery. At some point after she left Strobel, Roy was approached by defendant and Kryla. In his statement to police, defendant asserted that Kryla spoke to Roy and that it was Kryla's idea to go into the cemetery. He further stated that he had never been in the cemetery before because he was "scared of the dark," but that he had followed Kryla and Roy into the cemetery because Kryla had directed him to do so.

The defendant stated that he sat in the cemetery and watched as Kryla and Roy engaged in sexual intercourse, which he stated was consensual. The defendant could not recall whether he had also engaged in sexual intercourse with Roy. He further stated that after Kryla and Roy had sexual intercourse they began to argue and an altercation between Kryla and Roy ensued. Although he did not say that he knew why Kryla and Roy were fighting, defendant mentioned that he heard Roy ask Kryla "for some kind of drugs, like blow, coke or something." At that point, defendant averred, Kryla picked up a tombstone and began pummeling Roy with the stone. The defendant stated that he was standing next to Roy at that time and that she reached out for him, grabbed him and cried "help me, help me." The defendant responded to her plea by hitting Roy with his hand and pushing her away. The defendant recalled Roy as being covered in blood when he hit her, and that her blood spilled onto his pants and shirt. According to defendant, Roy was trying to run from this horrific attack but could not escape. The defendant stated that he decided to leave while Kryla was still beating Roy. He said that as he was leaving, he heard Kryla shout for him, and they left the cemetery together. The defendant stated that at that point, Roy was "just lying there shaking."

Additional facts will be supplied insofar as they are pertinent to the issues raised in this appeal.

## Discussion

### A. Determination of Unavailability of a Witness by the Trial Justice

Jermaine Bell (Bell) was a state's witness who was subpoenaed by the Pawtucket Police Department but failed to appear and testify at trial. The trial justice declared Bell unavailable, and admitted into evidence Bell's prior testimony given at defendant's bail hearing pursuant to Rule 804(b)(1) of the Rhode Island Rules of Evidence. The defendant contends that the admission of Bell's testimony violated his right to confront and cross-examine the witness and constitutes reversible error. We disagree.

Bell testified that he saw defendant and Kryla speaking to Roy on that fatal night at around 10 p.m. Bell stated that he

overheard Kryla say to defendant, "come on Derek, let's go rob [Roy]," to which the defendant responded by shaking his head affirmatively. Bell then testified that he watched them walk hurriedly to catch up to Roy, and that was the last time he saw them. He also stated that the Mineral Spring Cemetery was two streets away from where he last saw Kryla and the defendant with Roy.

■ The Confrontation Clause of the Sixth Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment, provides that " '[i]n all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him.' " *Pointer v. Texas,* 380 U.S. 400, 400–01, 85 S.Ct. 1065, 1066, 13 L.Ed.2d 923, 924 (1965). This right affords the defendant the right to cross-examine witnesses. *Id.* at 401, 85 S.Ct. at 1066, 13 L.Ed.2d at 924. The United States Supreme Court has emphasized that the Confrontation Clause reflects a preference for face-to-face confrontation at trial, and that "a primary interest secured by [the provision] is the right of cross-examination." *Ohio v. Roberts,* 448 U.S. 56, 63, 100 S.Ct. 2531, 2537, 65 L.Ed.2d 597, 606 (1980) (quoting *Douglas v. Alabama,* 380 U.S. 415, 418, 85 S.Ct. 1074, 1076, 13 L.Ed.2d 934, 937 (1965)).

■ In the case at bar, defendant contends that the state failed to make diligent efforts to secure Bell's attendance at trial, and therefore Bell was not unavailable and his former testimony should not have been admitted. Rule 804 allows for the introduction of certain hearsay statements when a declarant is deemed unavailable to testify at trial. In *Roberts,* the United States Supreme Court held that the basic litmus test of whether a witness's unavailability at trial violates the defendant's right of confrontation is whether the state has made a "good faith" effort to secure that witness's presence at trial. *Roberts,* 448

U.S. at 74, 100 S.Ct. at 2543, 65 L.Ed.2d at 613 (quoting *Barber v. Page,* 390 U.S. 719, 724–25, 88 S.Ct. 1318, 1322, 20 L.Ed.2d 255, 260 (1968) ("[A] witness is not 'unavailable' for purposes of the * * * exception to the confrontation requirement unless the prosecutional authorities have made a good-faith effort to obtain his presence at trial")). The Court equated "good faith" with the reasonableness of the state's efforts to produce the declarant at trial. *Id.* "The lengths to which the prosecution must go to produce a witness * * * is a question of reasonableness." *Id.* (quoting *California v. Green,* 399 U.S. 149, 189 n. 22, 90 S.Ct. 1930, 1951 n. 22, 26 L.Ed.2d 489, 514 n. 22 (1970) (concurring opinion)).

■ Whether the state has exercised reasonable diligence in securing the presence of a witness is assessed on a case-by-case basis. *State v. Prout,* 115 R.I. 451, 455, 347 A.2d 404, 406 (1975); *State v. Ouimette,* 110 R.I. 747, 755, 298 A.2d 124, 130 (1972). The question of whether the state's efforts were reasonable in attempting to locate a missing witness is left to the sound discretion of the trial court, and "that discretion will not be interfered with upon appeal unless an abuse thereof is affirmatively shown." *Ouimette,* 110 R.I. at 755, 298 A.2d at 130. The burden is on the defendant to "affirmatively show that the trial justice abused his discretion." *Prout,* 115 R.I. at 456, 347 A.2d at 406.

■ Based upon the facts presented, we conclude that the trial justice did not abuse his discretion in finding that Jermaine Bell was unavailable to testify at trial.

At trial, Sgt. Bruce Moreau of the Pawtucket Police Department testified that on April 24, 1996, at the start of trial, he personally served Bell with a subpoena directing him to appear in court and testify on April 29, 1996.[3] In addition, Sgt. Mor-

---

**3.** In addition to serving Bell with a subpoena, the state brought Bell to Family Court to

cancel an active Family Court capias warrant. The state argued that it arranged for the war-

eau also testified that he orally instructed Bell to appear in court on that date and that Bell voiced no objection to this instruction. The prosecutor reinforced Sgt. Moreau's instructions by warning Bell about the consequences of his failure to appear. Bell assured Sgt. Moreau that he would appear, and gave both Sgt. Moreau and the prosecutor phone numbers, including his pager number where he could be reached. However, on the eve of trial, Sgt. Moreau tried unsuccessfully to contact Bell to make arrangements for Bell's transportation to the courthouse. On the day of trial, Sgt. Moreau went to the address that Bell provided to him, 16 Comstock Street, Pawtucket, Rhode Island, an address at which Bell assured him he could be reached. Once again, Sgt. Moreau was unsuccessful at locating Bell. Sergeant Moreau stated that he spoke with Bell's neighbors, who reported that they had not seen Bell, and he also conferred with Bell's mother, who told him that she had not seen Bell for several days. Sergeant Moreau testified that he attempted twenty to twenty-five times to page Bell at the number Bell had provided, but that Bell failed to respond. Sergeant Moreau testified that he had reason to believe that Bell may have been staying in Narragansett. Besides his own search, he testified, he enlisted the help of the Narragansett Police Department to assist in his efforts to secure Bell's attendance at trial. Once again, however, this search was fruitless. On April 30, the trial justice issued a bench warrant for Bell's arrest. Sergeant Moreau subsequently contacted the Pawtucket Police Department advising it to search Bell's Pawtucket neighborhood to see whether officers could locate him. Sergeant Moreau further testified that several officers searched the area, but to no avail. Sergeant Moreau testified that he had spoken with Bell's brother Julius, who was not aware of his brother's whereabouts. Sergeant Moreau also indicated that on the morning of May 1, 1996, he revisited Bell's Comstock Street apartment, but no one answered the door, and the occupants of the first and second floors reported that they had not seen Bell.

After considering the testimony of Sgt. Moreau, the trial justice agreed with defense counsel that because Bell gave the appearance of a willing witness, he may have been confined somewhere involuntarily. The trial justice instructed the state to search the state training school as well as local hospitals. The state, through Sgt. Moreau, made inquiries at approximately nine different institutions, including hospitals in Pawtucket and South Kingstown, the Attorney General's juvenile unit, the Providence Police Department, Bell's probation officer, the Department of Children, Youth, and Families, and the state training school. All these inquiries proved fruitless. Although defendant was amenable to a one- or two-day continuance so that further efforts could be made to locate Bell, the trial justice concluded that any continuance to search for Bell would be futile at that point because there were no new leads for Sgt. Moreau to pursue, and to continue making the same inquiries would be unavailing.

We have examined the testimony of Sgt. Moreau and conclude that the trial justice did not err in finding that the prosecution made a reasonable and "good-faith" effort to secure Bell's presence at trial. The prosecution properly subpoenaed Bell and explained to him the consequences of his failure to appear. Also, we recognize that when it became apparent that Bell may have absented himself, Sgt. Moreau conducted a search of the locations in Pawtucket where he had reason to believe Bell was staying and went as far as enlisting the aid of the Narragansett Police in attempting to locate Bell in Narragansett. Sergeant Moreau personally inquired of Bell's family members as well as with his neighbors, and continually attempted to

rant cancellation to prevent any arrest on the warrant from interfering with Bell's ability to

appear in court and testify in the defendant's case.

page Bell in an effort to locate him. Further, we note that until the first day of trial, Bell had been a cooperative witness for the state, and therefore we do not fault the state for not taking steps to prevent his disappearance prior to trial. We note that the trial justice took instant remedial action by issuing a bench warrant for Bell's arrest when it became apparent that Bell would not be present at trial.

Further, although the initial search may have been incomplete in light of the failure to search the various hospitals and the training school, the defendant does not allege bad faith on the part of the prosecution, and at the trial justice's request, a subsequent inquiry was made of those facilities to determine if Bell was confined. We conclude that this subsequent effort was adequate under the Sixth Amendment. In hindsight, there may have been additional steps the prosecution could have undertaken in an effort to locate Bell. Nevertheless, given the great improbability that those efforts would have resulted in locating the witness in a timely manner, the prosecutor's failure to do so was not unreasonable.

The testimony of Sgt. Moreau, together with the issuance of a warrant for Bell's arrest and the search of the facilities where Bell may have been detained, was sufficient to satisfy the requirement of reasonable good faith efforts on the part of the prosecution for the trial justice to declare Bell unavailable. Therefore we conclude that the trial justice did not abuse his discretion when he found that Bell was unavailable to testify under Rule 804, nor do we perceive any error by the introduction of Bell's prior testimony.

### B. Trial Justice's Refusal to Instruct Jury on Second–Degree Murder

We turn next to defendant's contention that the trial justice improperly refused to instruct the jury on the lesser included offense of second-degree murder. Before addressing the merits of this contention, we must first determine whether defendant successfully preserved the issue for appellate review.

■ "This Court has repeatedly admonished counsel that, when assigning error to an omission from a charge, Rule 30 of the Superior Court Rules of Criminal Procedure specifically requires that a party 'direct[ ] the trial justice's attention to the matter to which he objects and give[ ] the grounds for his objection.'" *State v. Brown*, 549 A.2d 1373, 1376 (R.I.1988) (quoting *State v. Cianci*, 430 A.2d 756, 765 (R.I.1981)). In *State v. Olink*, 507 A.2d 443, 447 (R.I.1986), we stated that "[w]e shall not require an objection to be so detailed that citation to authority or a lengthy dissertation is necessary." Instead, "the objection should be reasonably calculated to alert the trial justice of the nature of the alleged error, and it should be stated with some specificity." *Id.* Thus, to preserve the issue for appeal, "after directing the trial court's attention to the asserted error or omission, counsel must articulate with reasonable clarity the precise grounds for [his or her] objection." *Brown*, 549 A.2d at 1376. This Court has declared that merely objecting by a number to the jury charge is insufficient to preserve the issue for appellate review. *State v. DeCiantis*, 501 A.2d 365, 369 (R.I. 1985).

■ In the case at bar, defense counsel submitted numerous written requests and one oral request for jury instructions. Of these requests, three (numbers 13, 14 and 15) pertained to the charge of second-degree murder.[4] The final instruction re-

---

4. Defense counsel requested the following instructions:
"SECOND DEGREE MURDER
"REQUEST NO. 13
"Murder of the second degree results when there is an unlawful killing of a human being with malice aforethought, but the conscious design or intent to kill existed for only a moment.
"REQUEST NO. 14
"The distinguishing feature between first and second degree murder is the mental

quested by defense counsel was submitted orally to the trial justice and requested an instruction on simple assault. The trial justice denied defendant's requests for jury instructions individually by number, including those pertaining to second-degree murder. Subsequently, the trial justice asked defense counsel if she had "any specific exception to the charge as given." Unlike the defense counsel in *Brown*, who made a specific objection to the trial justice's failure to instruct on a lesser-included offense, defense counsel in the instant case never directed the trial court's attention to the omission, but instead renewed her request for a simple assault instruction.[5] At no time did defense counsel clarify why she thought the trial justice should give an instruction on second-degree murder. We therefore conclude that because counsel failed to elucidate the reasons for a second-degree murder instruction, defendant may not now argue those reasons on appeal.

■■■ Nonetheless, we note that if the issue had been properly preserved, we are satisfied the appeal is without merit. It is well settled that a criminal defendant is "entitled—and the trial justice is required—to instruct the jury on [a] lesser

included offense * * * [w]hen the evidence supports a possible verdict on a lesser included offense." *State v. Messa*, 594 A.2d 882, 884 (R.I.1991) (citing *State v. Hockenhull*, 525 A.2d 926, 930 (R.I.1987)). However, an instruction on a lesser offense is not necessary "when such a charge is wholly unsupported by the evidence." *State v. Figueras*, 644 A.2d 291, 294 (R.I. 1994) (citing *State v. Austin*, 462 A.2d 359, 366 (R.I.1983)).

■■■ Because defendant in this case was on trial for first-degree murder, "he was also on trial for all lesser-included offenses and, thus, was simultaneously on trial for [second-degree murder]." *State v. Grabowski*, 644 A.2d 1282, 1286 (R.I.1994). The distinction between first-degree and second-degree murder is that first-degree murder "requires proof of premeditation of more than a momentary duration and proof of deliberation whereas second-degree murder does not." *Id.* at 1285. Accordingly, we have declared that "[i]f that premeditation is more than momentary, the murder is in the first degree and no charge on second degree murder is necessary; if it could be less, then the offense may be murder in either the first or sec-

operation with which the homicidal act was done.

"Murder in the second degree includes those cases of murder where the killing is lacking one or more of the essential elements of the first degree murder which are premeditation for some appreciable length of time, deliberation, and willfulness.

"To raise the offense to first degree murder, the State must prove beyond a reasonable doubt:

"(a) that the premeditation, which is the conception of the design or intent to kill, existed for more than a barely appreciable length of time before the killing; that is, it must have had something more than a momentary existence;

"(b) deliberation which is a reconsideration of the design to kill, a weighing of the pros and cons with respect to it; and

"(c) willfulness which means an intentional execution of the plan to kill which had been conceived and deliberated upon.

"If the State fails to prove any of these further elements, the offense remains murder in the second degree, assuming that the other requirements of murder have been met. *State v. Anderson*, 35 N.J. 472, 497[,] 173 A.2d 377, 389 (1961); *State v. Fenik*, 45 R.I. 309, 315[,] 121 A. 218, 221 (1923).
"*REQUEST NO. 15*
"That which distinguishes first from second degree murder is the length of time premeditation existed before the killing. Malice aforethought is the element which distinguishes murder in whatever degree from manslaughter. *State v. Crough*, 89 R.I. 338, 353[,] 152 A.2d 644, 652 (1959); *Beardslee v. United States*, 387 F.2d [280], 289, 291 (8th Cir.1967)."

5. Defense counsel responded to the trial justice's request as follows:

"Only in that the record, I'm sure, reflects that I had asked the Court verbally to instruct on simple assault and I renew that request at this time."

ond degree, and a charge on both must be given." *State v. Campbell*, 691 A.2d 564, 572 (R.I.1997) (quoting *State v. Myers*, 115 R.I. 583, 591, 350 A.2d 611, 615 (1976)).

In the case at bar, as already noted, Dr. Krolikowski graphically detailed the numerous injuries covering Roy's entire body. He specifically noted the injuries to Roy's right arm, from her mid-arm to her hand area, which was bruised to the point of hemorrhage. According to Dr. Krolikowski, these arm bruises were consistent with defense wounds inflicted from a round blunt object. This evidence reveals that Roy was subjected to a sustained attack prior to her death. Also, in light of the fact that when Roy's body was discovered she was wearing pants, Dr. Krolikowski's testimony about the abrasions on her knees, legs, and upper buttocks was evidence that part of this vicious attack occurred while Roy was still naked and thus suggests a prolonged period during which this attack continued.

It is clear to us that a jury could properly conclude from the evidence that both defendant and Kryla must have participated in this murder in concert. The facts show that the tombstone weighed more than seventy-eight pounds and was found about one hundred feet from its base where Roy's body was discovered. There was also ample evidence that Roy was trying to flee this horrific attack. There was a trail of blood on the roadway where Roy was found, her underwear, shoes and blouse were left behind, and she failed to fasten her pants, indicating that she was fleeing in haste.

Our review of the evidence, together with Dr. Krolikowski's testimony, leads to the conclusion that Roy was viciously murdered in a manner that demonstrated more than momentary resolve. We are satisfied that the state produced ample evidence to support a conviction for first-degree murder. Accordingly, because there was no evidence to support an instruction on second-degree murder, we are satisfied that such an instruction was not warranted. We conclude that the trial justice did not err in refusing to charge the jury on the elements of second-degree murder.

## Conclusion

For the foregoing reasons, the defendant's appeal is denied and the judgment appealed from is affirmed. The papers of the case are remanded to the Superior Court.