**STATE**

v.

**Francisco SOSA.**

No. 2001–184–C.A.

Supreme Court of Rhode Island.

Dec. 22, 2003.

Jane M. McSoley, Aaron Weisman, Providence, for Plaintiff.

George J. West, Providence, for Defendant.

Present: WILLIAMS, C.J., FLANDERS, GOLDBERG, FLAHERTY, and SUTTELL, JJ.

## OPINION

GOLDBERG, Justice.

In this appeal, the defendant, Francisco Sosa (defendant or Sosa), asks this Court to set aside his first-degree murder conviction and remand this case for a new trial. Sosa alleges that the trial justice made erroneous evidentiary rulings, mistakenly refused to instruct the jury on the offense of second-degree murder, permitted a constitutionally infirm jury panel, and erroneously denied his motion for a new trial.

### Facts and Travel

On July 20, 1998, Bethzaida Vega (Bethzaida) hosted an afternoon cookout in the backyard of her first-floor apartment at 527 Cranston Street in Providence. Among the guests were Bethzaida's friend Wanda Cruz (Wanda), Bethzaida's neighbor LaTesha Tate (LaTesha), and LaTesha's friends, Erica Cambero (Erica) and Hugo Andino (Hugo). As the cookout drew to an end, Wanda's son, "CJ," came into the house and alleged that Sosa, who lived at 531 Cranston Street, had "smacked" him after he and Sosa's son argued. This prompted an argument between Wanda and Sosa, who denied having hit CJ. Bethzaida testified that Wanda shoved Sosa, who, in turn "smacked her around a couple of times," causing her to fall to the floor. Bethzaida then brought Wanda inside her apartment, away from defendant.

Erica testified that Hugo went into the kitchen and then left the house brandishing a kitchen knife. He chased Sosa down the driveway and off the property, at one point coming within ten to fifteen feet of catching him. Sosa filed a complaint with the Providence Police the next day. In the complaint, Sosa reported that the previous afternoon he had witnessed a ten-year-old boy holding his four-year-old son by the throat. When he went outside, he observed the same boy holding his son by his feet and dangling him over a wall. According to Sosa's police complaint, when he intervened, a Hispanic female approached him and punched him in the mouth, and then a Hispanic male threatened him with a knife and chased him off the property.

Defense witness Ana Puello, another resident of 527 Cranston Street, testified to a slightly different version of events. She said that she witnessed the interaction between Sosa and CJ from her apartment window. According to her, Sosa did not hit the child, and the boy lied when he told his mother that Sosa had "smacked him." The witness testified that three women then accosted Sosa, striking him and yelling "kill him." She said she also saw Hugo chase Sosa with a knife.

LaTesha testified that a few days later, on July 23, 1998, she was in the living room of her first-floor apartment at 527 Cranston Street playing cards and drinking beer with Erica, Hugo, and another man. Both LaTesha and Erica testified that about 6 p.m., Sosa came to LaTesha's apartment door asking for Bethzaida. LaTesha did not open the door, but did

look through the peephole. She testified that Sosa was wearing a dark blue shirt with a Red Sox logo. A few minutes later, Sosa appeared outside LaTesha's living room window and pointed out Hugo to his wife, saying: "That is him, I am going to get him." Sosa also yelled to Hugo directly, saying: "I am going to get you."

When Bethzaida arrived home a short time later, LaTesha reported defendant's threatening remarks. Bethzaida testified that she then went outside to retrieve her two children. While she was standing in the alleyway between the two apartments, she encountered Sosa's wife and warned her that her husband's behavior was endangering the children. At that point, she observed Sosa, gun in hand, climbing the fence that divided the two yards. Bethzaida also noticed that Sosa was wearing a blue shirt with a Red Sox logo. Bethzaida screamed to LaTesha to lock the doors, and ran to her eight-year-old son, who was playing basketball on the other side of the house. As she was bringing her older son inside, she heard a gunshot.

LaTesha and Erica testified that they heard Bethzaida yell a warning that Sosa was approaching with a gun. LaTesha, Erica, and Hugo ran toward the front porch, where Bethzaida's two-year-old son was playing. LaTesha stopped to pick up the phone and dial 911, while Erica and Hugo continued outside onto the porch. Erica testified that she saw Sosa approach Hugo with his hand behind his back, and that as the decedent reached down to pick up the two-year-old, Sosa shot him in the back. Hugo managed to get the child into LaTesha's apartment before collapsing on the floor; he was taken to Rhode Island Hospital, where he died during emergency surgery. Chief Medical Examiner Elizabeth Laposata, M.D., testified that death resulted from massive internal bleeding caused by a bullet that passed into Sosa's back and through his large bowel and mesenteric artery.

Responding police investigators took Bethzaida, LaTesha, and Erica to Providence police headquarters. Each gave a separate statement, and each selected Sosa's photograph as that of the shooter.

Over defense objection, the state was allowed to read the testimony of Antonio Gonzalez (Gonzalez) into the record. Gonzalez was a prosecution witness at a previous trial against Sosa for these same crimes. That trial resulted in a hung jury. Gonzalez was declared unavailable at this trial after police efforts to locate him proved unsuccessful. Gonzalez previously had testified that as he was leaving a Cranston Street liquor store on the evening of July 23, 1998, he heard a gunshot. He noticed a man wearing a red and blue shirt with a gun in his hand. The man ran into the parking lot of Gonzalez Taxi, where Gonzalez worked. Gonzalez Taxi is across the street from the Cranston Street liquor store. Gonzalez testified that although he did not see the man discard the weapon, he saw him leave the lot without the gun. Gonzalez then went toward the back corner of the lot and discovered a firearm under a red rug. That revolver, along with a .38–caliber projectile recovered from Hugo's body, were examined by Robert Hathaway of the University of Rhode Island Crime Laboratory, who determined that the fatal bullet was fired from that particular weapon.

As noted, Sosa's first trial, in June 2000, resulted in a mistrial because the jury was unable to reach a unanimous verdict. Sosa was retried before a second jury in October 2000 and was found guilty of first-degree murder and possession of a firearm without a license. His motion for a new trial was denied on November 10, 2000, and on January 16, 2001, the trial justice imposed a mandatory life sentence for the

first-degree murder conviction and a ten-year sentence on the illegal-weapon charge. This appeal followed.

# I

## Gonzalez's Prior Testimony

■ The defendant assigns error to the trial justice's decision to declare Gonzalez unavailable and to admit his previous testimony during the state's case-in-chief. The defendant contends that the introduction of former testimony infringed his constitutional right to confront and cross-examine the witnesses against him.

■ The Sixth Amendment to the United State Constitution, made applicable to the states through the Fourteenth Amendment, affords a criminal defendant the right to confront the witnesses against him or her. *State v. Scholl,* 661 A.2d 55, 58 (R.I.1995) (citing *Pointer v. Texas,* 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965)). Article 1, section 10, of the Rhode Island Constitution also guarantees a defendant the right of confrontation. *Scholl,* 661 A.2d at 58–59. The United States Supreme Court has emphasized that the Confrontation Clause reflects a preference for face-to-face confrontation at trial, and that "a primary interest secured by [the provision] is the right of cross-examination." *Ohio v. Roberts,* 448 U.S. 56, 63, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980) (quoting *Douglas v. Alabama,* 380 U.S. 415, 418, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965)).

The right to face-to-face confrontation is not absolute, however; "[t]he strict requirement of confrontation in the Sixth Amendment * * * is tempered by the dictates of practicality and judicial economy." *Scholl,* 661 A.2d at 59 (quoting *State v. Burke,* 574 A.2d 1217, 1222 (R.I.1990)). Rule 804(b)(1) of the Rhode Island Rules of Evidence provides that former recorded testimony of a witness is not excluded by the rule against hearsay if: (1) the declarant is unavailable to testify, and (2) the party against whom the testimony is now offered had the opportunity to develop that testimony on cross-examination. A witness is considered "unavailable" when he or she is "absent from the hearing and the proponent of his or her statement has been unable to procure the declarant's attendance by process or other reasonable means." Rule 804(a)(5).

■ In the case before us, there is no doubt that Sosa had the opportunity to develop Gonzalez's previous testimony through cross-examination. The record reveals that Sosa's attorney thoroughly cross-examined Gonzalez at the first trial in June 2000. Thus, the only question remaining is whether the trial justice abused his discretion when he determined that the state had made a good-faith effort to procure the witness's attendance at the second trial. We are of the opinion that he did not.

■ A witness's unavailability and the use of his or her former testimony at trial does not violate the defendant's right of confrontation if the proponent of that testimony has made a "reasonable" and "good faith" effort to procure that witness's attendance for trial. *Roberts,* 448 U.S. at 74, 100 S.Ct. 2531; *State v. Brown,* 744 A.2d 831, 835 (R.I.2000). "Whether the state has exercised reasonable diligence in securing the presence of a witness is assessed on a case-by-case basis." *Brown,* 744 A.2d at 835; *State v. Prout,* 115 R.I. 451, 455, 347 A.2d 404, 406 (1975); *State v. Ouimette,* 110 R.I. 747, 755, 298 A.2d 124, 130 (1972). This Court will not disturb a finding of reasonable diligence and good faith absent an affirmative showing that the trial justice abused his or her discretion. *Brown,* 744 A.2d at 835 (citing *Prout,* 115 R.I. at 456, 347 A.2d at 406).

In establishing the witness's unavailability, the state presented Detective Kerrion O'Mara (Det. O'Mara), who recounted the efforts he made to locate Gonzalez before the second trial. He said that he went to Gonzalez Taxi, where Gonzalez occasionally worked. Neighbors and cab drivers told Det. O'Mara that Gonzalez, although occasionally seen on the streets, was homeless. Nonetheless, they directed him to an abandoned house that he was known to frequent. Detective O'Mara visited that house, which was vacant and boarded up, but was unable to find Gonzalez. Detective O'Mara testified that he called area hospitals and checked the Bureau of Criminal Identification (BCI) and Adult Correctional Institutions (ACI) records to see whether Gonzalez had been arrested or incarcerated at any point between the first and second trial. When these avenues proved fruitless, he attempted to find an address for Gonzalez by checking with gas and electric utilities, post offices, and homeless shelters. Additionally, Det. O'Mara visited Cranston Street and Gonzalez Taxi on two other occasions, distributing his business card and pager number and asking people familiar with Gonzalez to contact him if they saw Gonzalez in the neighborhood or on the street.

The trial justice, citing this Court's decision in *Brown*, found that the state had exhibited "reasonable, diligent efforts * * * to corral [Gonzalez]." Accordingly, the trial justice declared Gonzalez unavailable and ordered that his previous testimony be read into the record. The defendant takes issue with this ruling, contending that the state's efforts to find Gonzalez fell short of the standard established in *Brown*. The defendant points to discrepancies between the efforts undertaken to locate an unavailable witness in *Brown* and the investigative search by Det. O'Mara. Specifically, defendant notes that the officer responsible for searching for the witness in *Brown*

enlisted the help of other police officers, while Det. O'Mara did not. Furthermore, defendant argues that Det. O'Mara's single visit to the abandoned house where Gonzalez was known to stay was insufficient.

■ We are not persuaded by Sosa's contentions. Detective O'Mara pursued the same avenues of inquiry that led him to locate Gonzalez for the first trial. These efforts included contacting known associates of Gonzalez who worked for Gonzalez Taxi. Detective O'Mara also searched the only building where Gonzalez was known to stay. Although Det. O'Mara did not enlist the help of other police officers in his search, he did distribute his business card and pager number to people in the Cranston Street area who were familiar with Gonzalez, thereby enlisting the help of those people most likely to encounter him. He also investigated other means of locating Gonzalez, including checking area hospitals and shelters, searching the ACI and BCI records, and inquiring with various utilities. Although additional steps could have been taken, including informing other police officers or searching the vacant building on more than one occasion, the touchstone of our unavailability analysis is reasonableness, not exhaustion. *See Brown*, 744 A.2d at 837 (upholding the reasonableness of the state's search despite the fact that "[i]n hindsight, there may have been additional steps the prosecution could have undertaken in an effort to locate [the witnesses]"). We are of the opinion that Det. O'Mara's search was reasonable and conducted in good faith.

■ Besides alleging a failure to exercise reasonable diligence to find Gonzalez, defendant also contends that because the police failed to prevent Gonzalez's absence initially after the first trial, he may not be declared unavailable. The defendant cor-

rectly notes that the duty to undertake reasonable efforts to procure a witness's attendance at trial includes the concomitant duty to make reasonable efforts to prevent that unavailability in the first place. *United States v. Mann*, 590 F.2d 361, 368 (1st. Cir.1978). As proof that the state failed to prevent his unavailability in the first instance, defendant points to the fact that Gonzalez was not notified after the first trial that the subpoena for his testimony remained in effect and that he might be called to testify a second time. Furthermore, even after a mistrial was declared, the police made no effort to contact Gonzalez in the ensuing four months, instead waiting until one week before trial to begin their search. Sosa contends that this "inaction" on the part of the police rendered the state's efforts to procure the witness unreasonable.

In *Mann*, the key prosecution witness, Joan Shine (Shine), was a seventeen-year-old Australian native who had been arrested on federal drug charges with the defendant when the two flew into Puerto Rico. After the indictment against Shine was dismissed, the witness was deposed before prosecutors allowed her to return to Australia. When asked during the deposition whether she would return to the United States to testify at the defendant's trial, she gave an equivocal response. Notwithstanding, prosecutors returned her passport and plane tickets, fully aware that she intended to leave immediately for Australia. When the defendant proceeded to trial, Shine refused to return and testify, despite the American embassy's offer to pay her travel expenses. The court declared the witness unavailable and ruled that Shine's deposition could be read into evidence. The First Circuit Court of Appeals reversed, holding that the government had failed to show that it had made a good-faith effort to obtain the witness's presence. *Mann*, 590 F.2d at 367. The

First Circuit reasoned that "[i]mplicit * * * in the duty to use reasonable means to procure the presence of an absent witness is the duty to use reasonable means to prevent a present witness from becoming absent." *Id.* at 368. That is not the case before us.

We are not persuaded that the state failed to prevent Gonzalez's absence or that its subsequent efforts to locate him the week before the second trial were unreasonable. Unlike *Mann*, there was no indication that Gonzalez would be unavailable for trial. Although the witness did not have a steady address, he was known to live and work in the Cranston Street area of Providence. Importantly, he appeared and testified at the first trial, giving the state no reason to believe he wouldn't do so again, if necessary. *Brown*, 744 A.2d at 837 ("[The witness] had been a cooperative witness for the state, and therefore we do not fault the state for not taking steps to prevent his disappearance prior to trial."). Although notifying all witnesses that they may be called back to testify is the better practice, we never have suggested that it is a prerequisite to a finding of unavailability. Furthermore, defendant has not demonstrated that informing Gonzalez that the subpoena remained in effect would have produced a different result—given his homelessness, the police would still have had to undertake a search for his whereabouts.

## II

### Second–Degree Murder Instruction

■ Sosa next argues that the trial justice committed reversible error when he refused to instruct the jury on second-degree murder. The trial justice noted that the fact that Sosa was in an altercation at the cookout three days earlier and had been chased away by the decedent,

who threatened him with a knife, militated against an instruction on second-degree murder. Further, there was eyewitness testimony that on the day of the murder, defendant appeared at Wanda's window and twice threatened Hugo, only to reappear some minutes later armed with a firearm, apparently intent on carrying out that threat. Accordingly, the trial justice ruled that "the evidence in that light bespeaks only of first-degree murder; a threat, and then the defendant arms himself, stalks, seeks out and then shoots his intended and indeed, announced victim."

 It is well established that a defendant on trial for first-degree murder also is simultaneously on trial for all lesser-included offenses, including second-degree murder. *Brown*, 744 A.2d at 838 (citing *State v. Grabowski*, 644 A.2d 1282, 1286 (R.I.1994)). The difference between first- and second-degree murder is the element of premeditation: first-degree murder "requires proof of premeditation of more than a momentary duration and proof of deliberation whereas second-degree murder does not." *Grabowski*, 644 A.2d at 1285. Accordingly, if the evidence suggests the possibility that the defendant's decision to kill was made a mere moment or less before the fatal shot, the trial justice must instruct the jury on both first- and second-degree murder. *Id.* Conversely, a trial justice should not instruct the jury on a lesser-included offense when that charge is unsupported by the evidence. *Brown*, 744 A.2d at 838 (citing *State v. Figueras*, 644 A.2d 291, 294 (R.I. 1994)).

We are of the opinion that the trial justice did not err in refusing to give a second-degree murder instruction. "In order to have been entitled to a jury charge on second-degree, there must have been minimal evidence produced tending to show that defendant did not act with pre-

meditation." *Figueras*, 644 A.2d at 294. The evidence in this case was otherwise. Although the means of death was a single gunshot, Sosa's numerous verbal threats to the victim and subsequent reappearance with a gun some minutes later indicated that the decision to kill Hugo was not instantaneous. *See id.* (holding that second-degree murder instruction was not warranted because the defendant had threatened to harm the victim days before the murder). The act of scaling the fence with gun in hand demonstrated sustained determination to come within firing range of the decedent, further supporting the conclusion that Sosa exhibited "more than momentary [resolve]" to commit the murder. *Brown*, 744 A.2d at 838–39. Accordingly, we are satisfied that the trial justice did not err in declining to instruct the jury on second-degree murder.

### III

### Jury Selection

The defendant's third assignment concerns the constitutional adequacy of the jury panel from which defendant's jury was selected. The panel consisted of approximately forty potential jurors, of which two apparently were of minority ethnicity. Just before the trial started, one of the potential minority jurors came forward and admitted to the court that she knew defendant and his mother and had discussed the case with her. When the trial justice asked the potential juror whether she had formed an opinion of the case, the juror responded, "Of course, your Honor. I won't lie about that. Of course." The trial justice excused her.

After the potential juror was disqualified, defense counsel pronounced himself "troubled by the fact that, with the exception of the juror who was just excused, there appears to be perhaps one member

of a discernable minority community [remaining]." Counsel suggested that members of the African–American and Latino communities were being excluded systematically from the jury selection process, and moved to dismiss the panel on grounds that it did not represent a fair cross-section of the community. The trial justice denied Sosa's motion as untimely, ruling that it should have been directed at the entire venire and not delayed until this particular panel was selected from a larger juror pool.

The United States Supreme Court has held that "the selection of a petit jury from a representative cross section of the community is an essential component of the Sixth Amendment right to a jury trial." *Taylor v. Louisiana,* 419 U.S. 522, 528, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975). To demonstrate a *prima facie* violation of the fair-cross-section requirement, the defendant must establish: "(1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this under representation is due to systematic exclusion of the group in the jury-selection process." *Duren v. Missouri,* 439 U.S. 357, 364, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979); *see also State v. Johnson,* 116 R.I. 449, 457, 358 A.2d 370, 375 (1976) (holding that "a defendant who complains about an absence from the jury of representatives from an identifiable segment of the community must prove that their absence is due to a preconceived plan conceived by those who are responsible for the formulation of the jury lists").

In our opinion, the trial justice did not abuse his discretion in denying defendant's motion to dismiss the panel. Although defense counsel articulated the ap-

propriate showing necessitated by *Taylor* and *Duren* to challenge the jury selection process, he failed to demonstrate any of the three factors set forth in those cases. Instead, defendant waited until a minority juror was disqualified and then moved to dismiss the particular panel outright. Given defendant's inability to provide any proof whatsoever to support his contentions, the trial justice correctly rejected the motion to dismiss the panel. *See State v. Gaines,* 528 A.2d 305, 308–09 (R.I.1987) (in which the "defendant makes neither an allegation nor a showing that the jury selection process * * * has resulted in the systematic and deliberate exclusion of members of a particular race, * * * defendant has clearly not met his burden of proof; thus the denial of his motion was not error"). If defendant was not ready to proceed with the requisite proof at the time of his motion, the appropriate step would have been to request a continuance and hearing so he could develop his allegations in an appropriate proceeding. Defense counsel did not request a hearing, leaving the trial justice no choice but to deny the motion to disqualify the particular jury panel. *Johnson,* 116 R.I. at 457, 358 A.2d at 375.

Moreover, even if defense counsel had established that the jury selection process was constitutionally flawed, dismissing the particular jury *panel* would scarcely have remedied the problem. The Sixth Amendment is designed to prevent the state from utilizing a *system* that deliberately excludes groups of potential jurors from the entire jury pool. *State v. Clark,* 112 R.I. 270, 275, 308 A.2d 792, 795 (1973). As the trial justice pointed out, defense counsel had merely "look[ed] around the room and s[aw] thirty people [he was] not happy with," and, instead of properly targeting his motion to the *entire venire* from which the panel was drawn, he

asked the court to dismiss the *particular panel* sitting in that particular courtroom. The defendant had no guarantee that the next panel selected from the venire would not have the same composition; indeed, according to defendant's logic, counsel could have continued asking for dismissals until he finally found a panel that satisfied him. This is not the function of the Sixth Amendment cross-section requirement.

We previously have held that "[a]n accused has no right to demand that members of his race be on the jury which tries him." *Clark*, 112 R.I. at 275, 308 A.2d at 795. Accordingly, we consistently have upheld the refusal of a trial justice to order a new jury panel when, as here, the basis of the objection was that members of a defendant's race were not adequately represented in a particular panel of assembled jurors. *State v. Perry*, 725 A.2d 264, 268 (R.I.1999); *Gaines*, 528 A.2d at 308–09; *Clark*, 112 R.I. at 275, 308 A.2d at 795. We reach the same result here.

## IV

### Motion for a New Trial

Sosa's final contention on appeal concerns the trial justice's denial of his motion for a new trial. Sosa alleges that the trial justice's decision was against the weight and sufficiency of the evidence. To support this allegation, defendant argues that the state's witnesses were unworthy of belief and suggests several alternative factual hypotheses that the jury should have deduced from the evidence. This argument is without merit.

When ruling on a motion for a new trial, the trial justice acts as a thirteenth juror and independently evaluates the credibility of the witnesses and the weight of the evidence. *State v. Otero*, 788 A.2d 469, 472 (R.I.2002) (citing *State v. Banach*, 648 A.2d 1363, 1367 (R.I.1994)).

Once a trial justice has evaluated the evidence and articulated his or her reasons for denying the new trial, we will not disturb that decision unless he or she "overlooked or misconceived material evidence relating to a critical issue or if the justice was otherwise clearly wrong." *State v. Bleau*, 668 A.2d 642, 646 (R.I.1995) (quoting *Banach*, 648 A.2d at 1367). The defendant has not pointed to material evidence that the trial justice overlooked, nor are we of the opinion that the trial justice clearly was wrong. Accordingly, we reject defendant's final assignment of error.

## Conclusion

For the foregoing reasons, the judgment of conviction is affirmed, and the case is remanded to the Superior Court.