**Supreme Court**

No. 2019-67-C.A.

(K1/12-0341A)

|  |  |
|---|---|
| State | : |
| v. | : |
| Tony Gonzalez. | : |

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 or Email opinionanalyst@courts.ri.gov, of any typographical or other formal errors in order that corrections may be made before the opinion is published.

State                    :

v.                     :

Tony Gonzalez.        :

Present:  Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ.

**O P I N I O N**

**Justice Long, for the Court.**  The defendant, Tony Gonzalez (defendant or Mr. Gonzalez), appeals *pro se* from a Superior Court judgment of conviction for first-degree murder, assault with intent to commit a felony, and two counts of discharging a firearm while committing a crime of violence.  This case had been previously tried, but this Court vacated the defendant's conviction based on our holding that the trial justice erred in failing to exclude evidence seized following the warrantless arrest of Mr. Gonzalez in his mother's home.  *State v. Gonzalez*, 136 A.3d 1131, 1154, 1159 (R.I. 2016).

Mr. Gonzalez alleges that three errors were committed by the trial justice: (1) the denial of his motion to suppress evidence obtained from his cell phone, which police seized following his warrantless arrest; (2) the denial of his motion to

- 1 -

discharge the jury in violation of the Sixth Amendment to the United States Constitution; and (3) the denial of his motions for a mistrial. Mr. Gonzalez also contends that the state violated its obligations under *Brady v. Maryland*, 373 U.S. 83 (1963). For the reasons stated herein, we affirm the judgment of the Superior Court. A summary of the facts relevant to this appeal follows, and additional facts are included in the discussion of the issues.

## Facts and Procedural History

Saturday, January 21, 2012, was a snowy winter day that began with the breakup of defendant and his "on and off" girlfriend, Patricia Delomba. Sadly, the day ended in senseless violence and tragedy for Ms. Delomba, her new boyfriend Matthew Chivers, and their mutual friend, Carl Cunningham.[1]

In the evening, hours after Ms. Delomba ended her longtime hectic relationship with defendant, defendant traded multiple phone calls with Mr. Chivers about meeting up for a fight. Mr. Gonzalez also communicated with Ms. Delomba; she told him via text message not to come to her house, but he responded that he was coming over. He also indicated that "the ACI was going to be his new home."

At 11:43 p.m., Ms. Delomba received a text message from defendant stating that he was on his way to her house. Shortly thereafter, Mr. Gonzalez arrived at the

---

[1] Ms. Delomba went on to marry Mr. Chivers and has taken his last name. This opinion refers to her by her maiden name, the name she used during the events giving rise to defendant's trial, so as to avoid confusion.

house and began banging on the door. When Ms. Delomba opened the door, Mr. Gonzalez said that he wanted to fight Mr. Chivers. Ms. Delomba told defendant to leave, and she slammed the door closed. However, defendant entered the house and pushed his way into the bedroom, where he found Ms. Delomba, Mr. Chivers, and Mr. Cunningham. The defendant, with a gun in hand, stated, "I got something for you." Mr. Chivers and Mr. Cunningham both attempted to take cover in the bedroom closet, but defendant fired bullets toward the closet until he exhausted his supply of ammunition, fatally wounding Mr. Cunningham. The defendant then fled the scene. Within minutes, Mr. Chivers and Ms. Delomba contacted 911 to report the shooting.

Shortly after Mr. Cunningham was fatally shot at around midnight, the police interviewed Ms. Delomba at the police station. She described what had transpired at her home, identified Mr. Gonzalez as the shooter, and authorized a search of her cell phone. She also gave the police Mr. Gonzalez's cell-phone number. Using the number, the police determined that defendant's cell phone was serviced through Sprint Metro PCS (Metro PCS). The police made an initial request to Metro PCS for any information about the cell phone in order to determine whether the phone and, in turn, Mr. Gonzalez could be located. Metro PCS did not have this capability. However, the police were able to locate Mr. Gonzalez at approximately 5:30 a.m. when his brother, who cooperated with the investigation, placed a controlled phone call to defendant.

Shortly after 7 a.m., police from the Warwick Police Department and the Providence Police Department arrested defendant in his mother's house without a warrant. Once at police headquarters, the police discovered a cell phone on defendant's person. They then applied for and executed two warrants: an administrative warrant served on Metro PCS to obtain any phone records associated with defendant and a search warrant for defendant's cell phone.

The search of defendant's cell phone revealed the phone's call log, along with photographs and text messages. The administrative warrant served on Metro PCS produced a log of all incoming and outgoing calls from defendant's cell phone in the hours surrounding the death of Mr. Cunningham. Although the Metro PCS call log did not reveal any names or other explicitly identifying information, the police managed to identify phone subscribers associated with numbers from the call log by using various internet search engines. The police tracked down several of those individuals and interviewed them in an effort to assist with their investigation.

Mr. Gonzalez was indicted in May 2012 on four counts: murder in the first degree, resulting in the death of Carl Cunningham; assault with intent to commit a felony; and two counts of discharging a firearm while committing a crime of violence. The defendant was tried by jury in 2013 and was found guilty on all counts. After our opinion in *Gonzalez*, in which we vacated defendant's conviction after concluding that the trial justice erred in failing to exclude evidence seized

during defendant's warrantless arrest, Mr. Gonzalez was retried in 2017; he was again convicted by a jury on all four counts. For those offenses, the trial justice sentenced Mr. Gonzalez to life imprisonment at the Adult Correctional Institutions for the murder conviction; a consecutive twenty-year sentence for the assault conviction; and a life sentence plus a consecutive ten years for the convictions for two counts of discharging a firearm when committing a crime of violence. Mr. Gonzalez timely appealed.

### The Motion to Suppress

In a pretrial motion, defendant had moved to suppress the cell phone along with any information retrieved from the cell phone, including the identity, testimony, statements, or evidence of certain individuals discovered through the phone records. The defendant asserted that, in accordance with this Court's opinion in *Gonzalez*, the cell phone was seized pursuant to an illegal arrest, and, therefore, the fruits of that seizure must be suppressed pursuant to the Fourth Amendment to the United States Constitution. *See Gonzalez*, 136 A.3d at 1156, 1159.

After hearing testimony by two officers involved in defendant's arrest and the subsequent search of his cell phone, the trial justice found that police obtained the cell phone as a result of defendant's unlawful arrest. The trial justice therefore suppressed the cell phone along with any information discovered on the cell phone. However, he denied the motion to suppress with respect to testimony of the

- 5 -

individuals discovered through the cell-phone records, finding that information to be admissible under the independent source doctrine. The trial justice cited testimony by one of the officers, who explained that he "learned of [the] identities by * * * taking the phone number that was given to him by Ms. Delomba very early in the investigation and bringing that to Metro PCS[,]" which, in turn, generated a call log; police were able to search the internet to identify subscribers for those numbers.

"When this Court reviews a motion to suppress, we 'will not overturn a trial justice's factual findings unless they are clearly erroneous.'" *State v. Tejeda*, 171 A.3d 983, 994-95 (R.I. 2017) (quoting *State v. Harrison*, 66 A.3d 432, 441 (R.I. 2013)). "With respect to any purported violations of a defendant's constitutional rights, 'this Court must make an independent examination of the record to determine if the defendant's rights have been violated.'" *Id.* (brackets omitted) (quoting *Harrison*, 66 A.3d at 441). "In conducting the independent examination, 'we view the evidence in the record in the light most favorable to the state.'" *Id.* (quoting *State v. Santos*, 64 A.3d 314, 319 (R.I. 2013)).

"The exclusionary rule, which includes within its scope certain evidence derived from illegal police activity, does not apply when the government learns of evidence from a source independent of the original violation." *State v. Ducharme*, 601 A.2d 937, 942 (R.I. 1991) (citing *Wong Sun v. United States*, 371 U.S. 471 (1963)).

Here, there is no question that defendant's arrest was illegal, as this Court decided in *Gonzalez*. *See Gonzalez*, 136 A.3d at 1154. Accordingly, our analysis is limited to considering whether the identity and testimony of the individuals that Mr. Gonzalez sought to suppress would have been discovered independent of the illegal arrest and, in turn, the discovery of defendant's cell phone on his person. After our independent review of the record, we cannot say that the trial justice's findings were clearly erroneous. The testimony by the officers involved in the search supports the finding that, although the police learned the identity of certain individuals after searching defendant's cell phone itself, they had lawfully obtained a call log pursuant to an administrative warrant served on Metro PCS using the phone number given to them by Ms. Delomba early in the investigation. Using various internet search engines, the police managed to assign identities to the phone numbers that appeared in the call log. As such, it is clear to this Court that the identity, and subsequent testimony, of the individuals that Mr. Gonzalez sought to suppress were obtained independently from the illegal seizure of his cell phone and, therefore, the trial justice did not err in denying defendant's motion to suppress.

## The Motion to Discharge the Jury

In a second pretrial motion, defense counsel moved for a change in venue on two grounds: the substantial media coverage surrounding defendant's trial and census data indicating "that a mere 3 to 4.6 percent of the population of Kent County

* * * is Hispanic or Latino and only 1.9 percent of said population is of two or more races." In arguing the motion, counsel conceded that there was no recent pretrial publicity, but he expressed his concern over substantial media coverage of the murder in 2012. Defense counsel, citing scant caselaw, also raised a concern about a constitutionally under-representative jury. He noted that defendant is Hispanic, a member of a distinctive community, and he cited the census data for Kent County. However, counsel acknowledged that he had no evidence, at that time, prior to voir dire, to suggest that Hispanic individuals were systematically excluded from the jury selection process in this case. The trial justice denied defendant's motion.

On October 12, 2017, immediately after the jury was impaneled, defense counsel challenged the makeup of the jury at sidebar. He moved to discharge the jury pursuant to the Sixth Amendment to the United States Constitution, referencing his pretrial argument, and he stated that "[t]here were no Hispanics in the jury pool that I was able to determine." Counsel also renewed his motion to change the venue of defendant's trial to Providence County, asserting that Providence County has a Hispanic population that is significantly greater than the Hispanic population of Kent County. The trial justice accepted counsel's assertions regarding the makeup of the Hispanic population in Providence County as true, but stated that

"without establishing some actual prejudice that would
flow to this defendant by not having Hispanics on the jury,
I think the Court is hard pressed to address that in any way.
I'm not aware of any case law in Rhode Island that

- 8 -

explores this issue at all. I think in the other cases I found from around the country it is generally an unsuccessful argument for change of venue."

The trial justice did not explicitly rule on defense counsel's motion to discharge the jury.

The following day, Mr. Gonzalez addressed the court directly and asked about the challenge to the array. Mr. Gonzalez sought an explanation because he did not participate in the sidebar motion and because he felt that the jury was not selected from a fair cross-section of the community. The trial justice and Mr. Gonzalez then had the following exchange:

> "THE COURT: Here is the thing, though, on any given day we don't know who a defendant is going to be in a case. I think what you are suggesting is that we selectively go out and make sure that we pack a jury with some people who will surely represent the ethnicity and race of the defendant. My understanding is the law doesn't go that far.
>
> "THE DEFENDANT: I understand.
>
> "THE COURT: What we can't do is make sure that we pick in a fashion to exclude them, to systematically or intentionally exclude. Obviously that would be completely inappropriate and unlawful but I'm not aware of anything that says you have to make sure you go out and find some and make sure they are in that group.
>
> "I understand your point. Maybe the law will evolve to that point some day, but I'm duty bound to follow the law as it exists. I am comfortable that this is a trial that is proceeding the way the law requires it to, and I just have no basis to grant the change of venue."

The defendant claims that the trial justice erred when he inappropriately addressed the challenge to the array of jurors.[2]

A motion to discharge an under-representative jury requires an analysis pursuant to the Sixth Amendment to the Constitution of the United States. "We engage in a *de novo* review of any questions of law and of mixed questions of law and fact involving constitutional issues." *State v. Querido*, 229 A.3d 410, 415 (R.I. 2020) (quoting *State v. Morris*, 92 A.3d 920, 924 (R.I. 2014)). As this Court has recognized on numerous occasions, defendants have a right under the Sixth Amendment to select a petit jury from a fair cross-section of the community. *See State v. Lawless*, 996 A.2d 166, 168 (R.I. 2010) (mem.); *State v. Sosa*, 839 A.2d 519, 528 (R.I. 2003); *State v. Raymond*, 446 A.2d 743, 745 (R.I. 1982); *see also Taylor v. Louisiana*, 419 U.S. 522 (1975). To demonstrate a prima facie violation of the fair cross-section requirement, a defendant must establish:

> "(1) that the group alleged to be excluded is a distinctive group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this under representation is

---

[2] The defendant also complains about certain statements that the trial justice offered while attempting to assure defendant that he would be tried fairly. The trial justice told defendant that the trial justice's reputation is well-regarded in the state and the ACI and that, "no one has a greater appreciation of the atmosphere in the courtroom" than he. He added, "I think I have been on the bench long enough that I'm pretty good at it[,]" and he cited trials over which he presided where minority defendants were found not guilty. We pause to note that such unfortunate statements do not assuage the concerns of defendants who worry about the fairness of their trial.

due to systematic exclusion of the group in the jury-selection process." *Sosa*, 839 A.2d at 528 (quoting *Duren v. Missouri*, 439 U.S. 357, 364 (1979)).

This Court takes seriously any alleged violation of the fair cross-section requirement. When presented with a challenge to the array of a jury, it is critically important that the trial justice undertakes the appropriate analysis under *Duren* and addresses the motion to discharge the jury accordingly. Our careful review of the record in this case reveals that the trial justice repeatedly and explicitly denied the motion to change venue, but that he did not specifically address the motion to discharge the jury, despite defendant's expressed concerns about the jury makeup.

However, it is also clear from the record that defendant failed to establish a prima facie violation of the fair cross-section requirement. Although there is no dispute that defendant is Hispanic and thus a member of a distinctive community, it was defendant's burden to provide evidence that indicates that the representation of Hispanic individuals in the "venire[] from which [his jury was] selected is not fair and reasonable in relation to the number of such persons in the community[.]" *Sosa*, 839 A.2d at 528 (quoting *Duren*, 439 U.S. at 364). Even accepting the census data for Kent County as accurate, counsel's observation that there did not appear to be any Hispanic jurors in the pool was not sufficient. Rather, to meet the second prong under *Duren*, defendant was required to introduce competent evidence—data—regarding the makeup of the venire from which his jury was

- 11 -

selected. *See United States v. Royal*, 174 F.3d 1, 6-7 (1st Cir. 1999) (explaining that the absolute disparity test "measures the difference between the percentage of members of the distinctive group in the relevant population and the percentage of group members on the jury wheel"). Without such data, or an appropriate statistical analysis of that data to indicate disparity, the trial justice could not properly assess defendant's challenge to the array.

Moreover, it was also defendant's burden to introduce evidence establishing that any under-representation of Hispanic jurors in Kent County was caused by a systematic exclusion of Hispanic individuals in the jury selection process. *See Berghuis v. Smith*, 559 U.S. 314, 332 (2010) (holding that systematic exclusion cannot be established "merely by pointing to a host of factors that, individually or in combination, *might* contribute to a group's underrepresentation").

We therefore conclude that there is no evidence in the record to support defendant's claim that the trial justice erred when he did not discharge the jury impaneled on October 12, 2017.

**The Motion to Pass**

Mr. Chivers testified at defendant's trial. After testifying on direct examination that he saw the gunman reach through the door wielding a black gun and wearing a "black vest or jacket * * * one of the bubble ones, old school bubble ones[,]" Mr. Chivers admitted on cross-examination that he never saw the gun or

- 12 -

observed the clothing of the gunman. On redirect examination, the state and the witness engaged in the following dialogue:

"Q: Matt, why did you lie?

"A: That is what I was told.

"Q: Who told you that?

"A: That is what I had heard.

"Q: When did you hear that?

"A: Throughout the years after the trial the first time."

Counsel for Mr. Gonzalez promptly objected to Mr. Chivers's reference to the previous trial and at sidebar moved to pass the case. After a lengthy discussion with the state and defense counsel, and after considering various factors such as the witness's "murmur and low tone of voice[,]" how clearly he was able to hear the reference to the first trial, and the attentiveness of the jury, the trial justice denied defendant's motion and gave a carefully-crafted curative instruction to the jury that made no mention of a previous trial, so as to avoid bringing more attention to the issue. The state then concluded its redirect examination of Mr. Chivers.

Counsel for Mr. Gonzalez began re-cross examination of the witness. Defense counsel asked Mr. Chivers if he had knowledge of the gunman's clothing through the media. After Mr. Chivers indicated that he did acquire this information through the media, counsel asked Mr. Chivers, "When this shooting occurred in 2012, did

- 13 -

you get that information from the Providence Journal?"; Mr. Chivers replied, "Yes, then I was talking with my wife after the last trial." Defense counsel immediately asked for a sidebar, the trial justice excused the jury for lunch, and counsel, again, moved to pass the case based on Mr. Chivers's reference to the previous trial. The trial justice invited the parties to conduct research and offer arguments later that afternoon. After listening to the arguments, the trial justice denied defendant's motion after finding that the second reference to the prior trial by Mr. Chivers did not "rise[] to the level of prejudice that is incurable." Accordingly, the trial justice gave the jury another curative instruction.

"The decision to pass a case and declare a mistrial belongs to the trial justice, and this Court gives great weight to his or her sound discretion." *State v. LaPlante*, 962 A.2d 63, 70 (R.I. 2009). "When ruling on a motion to pass a case, this Court will reverse a trial justice's ruling on appeal only if it was clearly wrong." *Id.*

Our caselaw does not require a trial justice to pass a case at each instance a witness offers a prejudicial statement against a criminal defendant. *See, e.g.*, *State v. Bolduc*, 822 A.2d 184, 186 (R.I. 2003) ("Not all potentially prejudicial statements or other disturbing events that occur during a trial require the trial justice to pass the case."). "The trial justice enjoys a ringside seat at the trial and therefore is in the best posture to determine whether a witness's inappropriate remark or action has so inflamed the jurors that they no longer would be able to decide the case based on a

- 14 -

calm and dispassionate evaluation of the evidence." *State v. Lynch*, 854 A.2d 1022, 1033 (R.I. 2004) (brackets omitted) (quoting *State v. Werner*, 830 A.2d 1107, 1113 (R.I. 2003)).

We cannot say that the trial justice abused his discretion or was clearly wrong by declining to declare a mistrial based on Mr. Chivers's two references to the first trial. After Mr. Chivers referenced "the trial the first time" and defense counsel objected and moved to pass the case at sidebar, the trial justice carefully deliberated and ultimately determined that any potential prejudice that may have resulted could be cured with an appropriate instruction to the jury. He did so only after a lengthy discussion with counsel for Mr. Gonzalez and the state about the effect, if any, that the witness's statement could have had on the jury based on the trial justice's own perception and observations.

After Mr. Chivers referenced the first trial for a second time, the trial justice dismissed the jury for lunch, entertained arguments from the parties, and, again, determined that any prejudice that might have resulted from the reference was not incurable. Of course, it is the trial justice who, because of his "ringside seat[,]" is in the best position to make such a determination. *See Lynch*, 854 A.2d at 1033. It is clear from our review of the record that the trial justice was sensitive to any effect that Mr. Chivers's references may have had on the jury, but that he ultimately found that any effect was negligible. *See, e.g.*, *Magraw v. Roden*, 743 F.3d 1, 9, 11 (1st

- 15 -

Cir. 2014) (mistrial not required after prosecutor made three references to prior trial); *Moore v. Quarterman*, 534 F.3d 454, 466-67 (5th Cir. 2008) (mistrial not required after witness made three references to prior trial).

## The Alleged *Brady* Violation

The defendant raises an additional argument before this Court on appeal: that the state violated its obligations under *Brady*, cited *supra*, by failing to provide him with a recording of the controlled phone call between him and his brother on the morning of his arrest. It is apparent from the record, however, that this issue was not raised prior to or during defendant's trial. Pursuant to our well-settled raise-or-waive rule, "no party may assign as error any portion of the charge or omission therefrom unless the party objects thereto before the jury retires to consider its verdict[.]" *State v. Hunt*, 137 A.3d 689, 693 (R.I. 2016) (brackets omitted) (quoting Super. R. Crim. P. 30). As such, we need not, and shall not, address this issue on appeal.

## Conclusion

For the reasons stated in this opinion, we affirm the judgment of the Superior Court. The record shall be returned to the Superior Court.



# STATE OF RHODE ISLAND

## SUPREME COURT – CLERK'S OFFICE
Licht Judicial Complex
250 Benefit Street
Providence, RI  02903

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | State v. Tony Gonzalez. |
| **Case Number** | No. 2019-67-C.A. (K1/12-341A) |
| **Date Opinion Filed** | July 2, 2021 |
| **Justices** | Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ. |
| **Written By** | Associate Justice Melissa A. Long |
| **Source of Appeal** | Kent County Superior Court |
| **Judicial Officer from Lower Court** | Associate Justice Daniel Procaccini |
| **Attorney(s) on Appeal** | For State:<br><br>Christopher R. Bush<br>Department of Attorney General |
| | For Defendant:<br><br>Tony Gonzalez, Pro Se |