STATE

v.

**Ricardo RAMIREZ.**

No. 2003–27–C.A.

Supreme Court of Rhode Island.

Dec. 17, 2007.

George J. West, Esq., Providence, for Plaintiff.

Jane M. McSoley, Esq., Providence, for Defendant.

Present: WILLIAMS, C.J., GOLDBERG, FLAHERTY, SUTTELL, and ROBINSON, JJ.

**OPINION**

Justice GOLDBERG, for the Court.

On September 26, 2002, a jury found the defendant, Ricardo Ramirez (defendant or Ramirez), guilty of first-degree murder. The trial justice denied the defendant's motion for a new trial, and on December 6, 2002, the defendant was sentenced to a term of life imprisonment. In addition, the trial justice sentenced the defendant to a consecutive twenty-five-year sentence as a habitual offender in accordance with G.L. 1956 § 12–19–21, the habitual offender statute.

The defendant has appealed to this Court, contending that the trial justice: (1) violated defendant's Sixth Amendment right of confrontation when he allowed prior recorded testimony of an unavailable witness to be read to the jury; (2) erred in admitting hearsay testimony; (3) violated defendant's Sixth Amendment right to present a defense by barring testimony of a defense witness; (4) committed reversible error when he refused to pass the case; and (5) erred in imposing an enhanced sentence based on alleged findings of fact by the court. For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.

**Facts and Travel**

The events leading up to this brutal homicide occurred over twenty-five years ago. On May 5, 1982, two college students decided to walk to a cemetery in North Smithfield and found themselves in a ravine near some railroad tracks. It was there, at the bottom of a thirty-foot hill, that they came upon the partially clad remains of a decayed body. The two brothers alerted the North Smithfield police who, in turn, notified the state medical examiner. At the scene, the medical examiner located a bullet hole in the back of the victim's skull and found a billfold with a driver's license bearing the name William Sargent (Sargent) in the decedent's pants pocket. The medical examiner later used dental records to positively identify Sargent's body. Doctor Elizabeth Laposata, the chief medical examiner for the State of Rhode Island, testified at trial that the manner of Sargent's death was an

"execution style" homicide. Although the body was found in 1982, the facts surrounding Sargent's disappearance and murder were slow to emerge.

Despite an intensive police investigation, the murder remained unsolved for many years. It was not until late 2000, that the case was assigned to Det. Stephen Riccitelli (Det.Riccitelli) of the North Smithfield Police Department and Det. John Killian of the Rhode Island State Police, whose efforts resulted in the arrest and indictment of defendant for this crime. Detective Riccitelli located Harold Marzini (Marzini), a retired Woonsocket police detective, who confirmed that Sargent had been a confidential police informant and had supplied Marzini with information on a regular basis. Marzini also recalled Sargent's associates, who were known to the police—Alfred Limburg (Limburg), Glen Bogan (Bogan), and Ramirez—and he described these men as frequent patrons of Mister Donut and the Court Street Pub in Woonsocket. These men also associated with defendant's cousin, Henry Cassidy (Cassidy), when he was not in jail.[1] From this colorful cast of characters, Det. Riccitelli was able to piece together the events leading to this brutal slaying.

The year was 1981; Ramirez, Bogan, and Sargent were engaged in a stolen-automobile operation in which they dismantled stolen vehicles in a "chop shop."[2] The facility was based in Blackstone, Massachusetts, in a garage rented by Limburg, who was an automobile dismantler and junkyard operator by trade. Limburg testified that he rented this garage to Sargent for approximately two months, around April 1981, until he discovered that Sargent was dealing in stolen automobiles at his garage. Limburg went to Sargent's home in Woonsocket, intending to put an end to the criminal activity; upon his arrival Sargent was concluding a telephone conversation. When Limburg asked Sargent about the phone call, Sargent informed him that he had been speaking with the Rhode Island State Police and that he was an informant. Unimpressed, Limburg told Sargent that he was closing the garage and that he should remove his belongings.

Meanwhile, Ramirez began to suspect that Sargent was a police informant. The defendant introduced Sargent to his cousin, Cassidy, and thereafter the men frequently met at Mister Donut. However, Cassidy, who at the time of trial was imprisoned at the Adult Correctional Institutions, suspected that Sargent was cooperating with law enforcement because he frequently used the pay telephone at the Mister Donut. Cassidy shared his suspicion with defendant and told Ramirez that he believed Sargent to be an informant because "he look[ed] like he [was] an undercover cop" and because he was "always" using a pay telephone.

The defendant began to investigate Sargent's informant activities, starting with Limburg. According to Limburg, "[Ra-

1. Cassidy was serving a twenty-year sentence for manslaughter at the time of trial.

2. A "chop shop" is defined in federal law as: "any building, lot, facility, or other structure or premise where one or more persons engage in receiving, concealing, destroying, disassembling, dismantling, reassembling, or storing any passenger motor vehicle or passenger motor vehicle part which has been unlawfully obtained in order to alter, counterfeit, deface, destroy, disguise, falsify, forge, obliterate, or remove the identity, including the vehicle identification number or derivative thereof, of such vehicle or vehicle part and to distribute, sell, or dispose of such vehicle or vehicle part in interstate or foreign commerce." 18 U.S.C. § 2322.
We agree with this characterization.

mirez] wanted to know if William Sargent was a police informant and if he was, he would kill him." Although Limburg refused to disclose what he knew, Ramirez persisted. On April 27, 1981, while at a Woonsocket bar, defendant repeatedly asked Limburg if Sargent was an informant. Limburg was not forthcoming; defendant was undeterred.

That evening, after returning home from a night of drinking, Limburg was awakened by Ramirez, who told Limburg that Sargent had named him as the informant and they needed to take action. Although apparently intoxicated, the two men set off to Sargent's house to "straighten this out." However, the pickup truck they were driving, registered to Sargent Artesian Well Company, crashed into a fire hydrant. Undaunted, they returned to Limburg's home to retrieve his van, but this trip also was unsuccessful—the vehicle was stopped by the Blackstone police and the two men were arrested. According to Limburg, they met Sargent later that morning and that was the last time he saw Sargent. Limburg did not cooperate with the police because he was afraid of Ramirez.

Bogan, another confederate in the stolen-car business, testified at the first trial and recounted similar conversations with Ramirez about Sargent and whether he was a police informant. Bogan recalled Ramirez telling him that "he heard [Sargent] was a rat." According to Bogan, defendant began mentioning that Sargent was "working for the cops" and "he'd take him out before he'd let him take him down."

In the ensuing weeks, defendant's obsession with Sargent's informant activities culminated in his murder. During the first trial, Bogan testified that late one evening Ramirez arrived at his home in blood-stained clothing. Bogan gave him clean clothes, and Ramirez disclosed that "he took Billy Sargent out" by shooting him in the head. Ramirez gave Bogan a plastic bag containing his bloody clothing with instructions to throw the bag into a nearby river; Bogan did so the next morning.[3] Bogan, like Limburg, feared Ramirez and refused to cooperate with the police.

The record discloses that Ramirez talked about the murder to others, including his brother-in-law, George Joyal (Joyal), as well as his former wife. Ramirez told Joyal that he had killed a man because he believed him to be an undercover Massachusetts narcotics officer. Ramirez told Joyal that he and the victim had walked to a ravine where he shot him twice with a .38–caliber gun. Like Limburg and Bogan, Joyal feared Ramirez and did not contact the police. In fact, Joyal told his sister the story, in the event that something should happen to him.

Based upon the investigation by Det. Riccitelli, the case was presented to a grand jury that returned a one-count indictment charging defendant with Sargent's murder. After a Superior Court jury trial, Ramirez was found guilty of first-degree murder. This appeal ensued.

# I

## Prior Recorded Testimony

The defendant contends that the trial justice violated his Sixth Amendment right of confrontation when he declared that Bogan was unavailable and allowed the state to introduce his testimony from an earlier trial that ended in a mistrial.[4] The record

3. The defendant also emptied the shell casings from a small revolver that he intended to "cut up" by bringing it to a machine shop in Connecticut.

4. The proceedings in the earlier trial ended in

discloses that Bogan was subpoenaed on August 30, 2002, and was uncooperative from the outset.[5] During a mid-trial hearing, Bogan refused to testify and invoked his Fifth Amendment privilege against self-incrimination, and the trial justice appointed counsel for the witness. Significantly, the trial justice found that Bogan properly had invoked his privilege against self-incrimination, prompting the state to seek immunity for the witness. The prosecutor asked the trial justice to admonish the witness that he was under subpoena and not free to leave the courthouse. The trial justice directed the witness to remain in the courthouse until he was released by his attorney.

Although the state began immunity proceedings, Bogan had other plans. Notwithstanding the trial justice's order that he remain available, Bogan disappeared. The trial justice issued a body attachment, and a mid-trial search for Bogan's whereabouts was undertaken by both sheriffs and police officers. The next day, after the prosecution recounted the state's efforts to locate Bogan, the trial justice declared him unavailable and his prior recorded testimony was read to the jury. Several days later, Bogan appeared at defense counsel's law office.

On September 23, 2002, defense counsel informed the trial justice that Bogan had turned up at his law office that morning; he contended that, as a result, the Court should strike Bogan's testimony or require the state to seek immunity so that Bogan could be called as a defense witness. Clearly frustrated with Bogan's antics, the state objected to the motion to strike the testimony and refused to pursue a grant of

immunity. At this point, although Bogan was present—apparently in the cellblock—and had counsel, he was nonetheless unavailable based on the trial justice's finding that he had a legitimate Fifth Amendment privilege not to testify.

The trial justice denied the motion to strike Bogan's testimony and refused to order the state to seek immunity for the witness. Based on the record before us, we are satisfied that the trial justice properly declared the witness unavailable and did not err in admitting Bogan's prior testimony. The fact that the witness reappeared after his testimony was read to the jury does not alter this holding.

## Analysis

 The Sixth Amendment to the United States Constitution, as applied to the states through the Fourteenth Amendment, affords a criminal defendant the right to confront and cross-examine the witnesses against the accused. *State v. Scholl*, 661 A.2d 55, 58 (R.I.1995) (citing *Pointer v. Texas*, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965)). Article 1, section 10, of the Rhode Island Constitution also guarantees the right of confrontation to a defendant in a criminal trial. *Scholl*, 661 A.2d at 58–59. The United States Supreme Court has declared that "the Confrontation Clause reflects a preference for face-to-face confrontation at trial, and that 'a primary interest secured by [the right of confrontation] is the right of cross-examination.'" *Ohio v. Roberts*, 448 U.S. 56, 63, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980) (quoting *Douglas v. Alabama*, 380 U.S. 415, 418, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965)).

---

a mistrial on May 9, 2002. During this trial, Bogan testified extensively under direct, redirect, and cross-examination about his relationship with and knowledge of Ramirez.

5. Bogan's reluctance to testify was no surprise to the parties in this case. The witness failed to appear voluntarily for the first trial; however, after a body attachment was issued, he appeared and testified.

■ However, the right of confrontation is not absolute but "is tempered by the dictates of practicality and judicial economy." *State v. Sosa,* 839 A.2d 519, 524 (R.I.2003) (quoting *Scholl,* 661 A.2d at 59). "Rule 804(b)(1) of the Rhode Island Rules of Evidence provides that former recorded testimony of a witness is not excluded by the rule against hearsay" when two conditions are met: "(1) the declarant is unavailable to testify, and (2) the party against whom the testimony is now offered had the opportunity to develop that testimony on cross-examination."[6] *Sosa,* 839 A.2d at 524. An unavailable witness is one who is "absent from the hearing and the proponent of his or her statement has been unable to procure the declarant's attendance by process or other reasonable means." *Id.* (quoting Rule 804(a)(5)).

■ In determining if a witness is unavailable, the trial justice must evaluate the reason for the absence and decide whether the proponent of the testimony made a reasonable and good-faith effort to secure the witness's attendance at the trial, including efforts to locate a witness who has purposefully absented himself or herself from the reach of the court. *Roberts,* 448 U.S. at 74, 100 S.Ct. 2531; *State v. Brown,* 744 A.2d 831, 835 (R.I.2000); *State v. Prout,* 115 R.I. 451, 455, 347 A.2d 404, 406 (1975); *State v. Ouimette,* 110 R.I. 747, 754–56, 298 A.2d 124, 130–31 (1972). If the trial justice is satisfied that appropriate, but unsuccessful, efforts were made to bring the witness to the courtroom, then the witness may be declared unavailable and his or her testimony may be introduced without violating the accused's right of confrontation. *Sosa,* 839 A.2d at 524. This Court will not disturb a finding of reasonable diligence and good faith on the part of the proponent of the testimony absent an affirmative showing that the trial justice abused his or her discretion. *Brown,* 744 A.2d at 835 (citing *Prout,* 115 R.I. at 456, 347 A.2d at 406).

In the case before us, defendant's argument centers on the unavailability part of Rule 804 and the decision of the trial justice not to strike Bogan's testimony after he reappeared or to order the state to seek immunity so that Bogan could be called as a defense witness. The defendant does not contend that he was deprived of an opportunity to cross-examine Bogan during the first trial, and the record reflects an extensive cross-examination spanning nearly twenty pages of transcript. We shall address the issues concerning Bogan's disappearance and reappearance that were preserved for appellate review.

■ Before this Court, defendant argues that the trial justice committed reversible error when he declared Bogan unavailable without first taking sworn testimony in an evidentiary hearing. The record discloses that on September 19, 2002, the day after Bogan eloped, the prosecutor notified the trial justice that a team of law enforcement officers had made considerable efforts to find Bogan, without success. The prosecutor informed the trial justice that the officers had checked several locations that Bogan was known to frequent in Providence and Woonsocket, as well as the homes and work places of his family, all to no avail.

6. Rule 804(b) of the Rhode Island Rules of Evidence provides in pertinent part:

"(b) *Hearsay Exceptions.* The following [is] not excluded by the hearsay rule if the declarant is unavailable as a witness:

"(1) *Former Testimony.* Recorded testimony given as a witness at another hearing of the same or a different proceeding * * * if the party against whom the testimony is now offered * * * had an opportunity to develop the testimony by direct, cross, or redirect examination."

Additionally, the defense also attempted to find Bogan without success. The defendant argued that it was premature to declare Bogan unavailable because the state had not satisfied the court that Bogan was unavailable to justify the use of his previous testimony. Although defendant offered no facts or evidence to contest the state's efforts to find the witness, counsel proposed that the trial proceed and that the state call its witnesses out of order while the search continued. The state objected and argued that Bogan's testimony was necessary for the jury—which had already been sworn—to place the remaining evidence in its proper context.

The trial justice noted the extensive precautions that were taken to safeguard Bogan's rights, including the appointment of counsel and the state's efforts to obtain immunity. The trial justice found that diligent efforts had been made to locate the witness and that the state had a right to present its case in an orderly manner. At that point, the witness was declared unavailable and his testimony was read to the jury. Bogan reappeared four days later.

We are satisfied that a significant search was undertaken for Bogan before he was declared unavailable. It is significant that defendant did not move for an evidentiary hearing and, based on our well-settled raise-or-waive rule, we deem this issue waived. *State v. Russell,* 890 A.2d 453, 462 (R.I.2006). Although we have recognized an exception to the raise-or-waive rule, the alleged error must be more than harmless, and must implicate an issue of constitutional dimension, arising from a novel rule of law that could not reasonably have been known to counsel at the time of trial. *State v. Gomes,* 690 A.2d 310, 319 (R.I.1997). Because defendant never requested an evidentiary hearing and failed to identify any of the narrow exceptions to

the raise-or-waive rule as applying to his claim, we hold that this issue has been waived. Notwithstanding, even if this issue was properly before us, it is without merit.

In this case, the trial justice was required to rule on Bogan's unavailability and the state's efforts to locate him at several points in the trial. The trial justice first declared Bogan unavailable based on reports of law enforcement agencies. He noted that "due diligence has been engaged in by legitimate law enforcement officers to try to locate this person pursuant to a court order." After the witness reappeared, the trial justice again found that the state's earlier efforts had been diligent and in good faith. The trial justice also noted the various precautions the court had taken to safeguard the witness's rights, including the appointment of counsel. After reviewing the record in this case, we agree with this finding and discern no evidence in the record to suggest otherwise.

Although defendant questioned the length of time devoted to the search, he failed to challenge the fact that the prosecutor made oral representations to the trial justice or the veracity of those statements; nor did defendant request an evidentiary hearing. Affording the trial justice appropriate discretion, we decline to disturb the ruling that Bogan was unavailable. Nor are we persuaded that the failure to take sworn testimony was reversible error.

### The Failure to Conduct an Evidentiary Hearing

The defendant argues that the trial justice abused his discretion when he failed to require sworn testimony from the officers who searched for Bogan. According to Ramirez, this Court has not been confronted with a finding of unavailability in the

absence of an evidentiary hearing. However, we have never held that a party's assertion that a witness is unavailable must be supported by sworn testimony, nor does the case law cited by the defendant support such a contention. In *State v. Hannagan*, 473 A.2d 291, 292 (R.I.1984), a witness became physically ill on the witness stand and left the courthouse. The trial justice ruled that the witness was unavailable based upon the prosecution's representations as well as his own personal observations. *Id.* at 292–93. We reversed and concluded that in instances of unavailability because of illness, expert testimony is necessary. *Id.* at 293. We declared that "[o]nly by insisting upon competent proof of a witness's unavailability for the purposes of invoking the prior-testimony exception to the hearsay rule can we adequately ensure that the fundamental guarantees of confrontation and cross-examination of one's accusers will be preserved for an accused." *Id.* at 293–94 (citing *State v. Scholz*, 432 A.2d 763, 767 (Me.1981)). Here, the witness's unavailability was two-fold—flight from the courthouse and a Fifth Amendment privilege not to testify absent a grant of immunity. While we held in *Hannagan* that a trial justice is not equipped to evaluate the nature or extent of an illness in the absence of competent medical opinion, *id.* at 293, such is not the case when a reluctant and uncooperative witness flees the courthouse in the middle of the trial.

■ Although in *Sosa*, 839 A.2d at 525, the trial justice entertained testimony from the police officer charged with searching for the missing witness and this Court upheld the decision declaring the witness unavailable, we did not hold, nor do we do so today, that sworn testimony is an essential precedent to a finding of unavailability. In this case, unlike *Sosa*, the witness had appeared and testified in a mid-trial hearing and the trial justice was privy to the succeeding events as they were unfolding. After Bogan disappeared, the state commenced a search and apprised the trial justice of its efforts. The trial justice declared, on more than one occasion, that he was satisfied with the state's efforts to procure Bogan's attendance at the trial. We are not persuaded that an evidentiary hearing would alter this finding.

### The State's Efforts to Locate the Witness

■ The defendant also contends that the state's search for the witness was not in good faith because it had notice of Bogan's reluctance to testify and therefore had "an affirmative duty to prevent him for disappearing" and failed to make reasonable efforts to prevent his disappearance in the first place. The defendant's reliance on *United States v. Mann*, 590 F.2d 361 (1st Cir.1978) as support for this argument is misplaced. In *Mann*, after the witness testified under oath at a deposition and indicated an unwillingness to testify, the prosecution returned her passport as well as a plane ticket to Australia. The First Circuit Court of Appeals held that the trial judge erred in declaring the witness unavailable because the government had failed to adequately ensure the witness's presence at trial and would have made a more vigorous effort if it did not have the benefit of her prior recorded testimony. *Id.* at 367–68. In this case, the state not only sought immunity for the witness, but also the prosecutor repeatedly asked the trial justice to order that the subpoena remain in force and to remind the witness that he was not free to leave until he was excused. Thus, we do not discern bad faith on the part of the prosecution, nor are we persuaded that the search efforts were inadequate.

We recognize that a search is not judged by its results, but rather by its nature—since "[o]ne, in hindsight, may always think of other things." *Roberts*, 448 U.S. at 75, 100 S.Ct. 2531. Here, the witness was a local resident who had appeared in Court on prior occasions and freely testified. In fact, the trial justice found that during the first trial, after the witness was compelled to appear, Bogan exhibited "no hesitancy whatsoever in his performance before the jury at that time." Although Bogan suggested that he might flee, the trial justice ordered him to remain in the courthouse until he was given permission to leave. Moreover, the record amply demonstrates that after the trial justice issued a body attachment, the state conducted a thorough search for Bogan's whereabouts. We decline to hold that the state's efforts were not in good faith simply because Bogan disappeared in the first place. "The fact that the means utilized were unsuccessful does not mean that the government's efforts were not made in good faith." *United States v. Eufracio–Torres*, 890 F.2d 266, 270 (10th Cir.1989). We therefore reject this argument.

### The Refusal to Seek Immunity

 Finally, defendant argues that after Bogan reappeared, his testimony should have been stricken, and Bogan should have been compelled to testify under a grant of immunity. We note at the outset that a trial justice has no authority to order the state to seek immunity for a witness. Only the Attorney General may request an immunity hearing. G.L.1956 § 12–17–15.[7] *See State v. Clark*, 576 A.2d 1202, 1205–06 (R.I.1990) (holding that the trial justice properly refused to order the state to seek immunity because such action is the responsibility of the Attorney General and not within the province of the court). Even so, the Attorney General does not have unbridled discretion with respect to immunity proceedings. *See Ferrell v. Wall*, 889 A.2d 177, 187 n. 4 (R.I.2005) (citing *Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935) (Although the state may determine whether to seek immunity for a witness, it may not base such a decision on "improper methods" calculated to bring a wrongful conviction.)).

 Here, the Attorney General readily sought an order immunizing the witness to secure his testimony after he invoked the Fifth Amendment. Further, the record is devoid of any evidence of improper conduct by the state that allowed Bogan to go missing. The fact that Bogan appeared, after his former testimony was read into evidence, does not give rise to an inference of prosecutorial bad faith. Nor are we of the opinion that simply because Bogan reappeared at a later point in the trial, the state was bound to seek immunity so that he could testify for defendant. A trial justice may not compel testimony from a witness who has invoked a legitimate Fifth Amendment right, *State v. Ducharme*, 601 A.2d 937, 944–45 (R.I.1991), nor may he or she compel the state to seek to immunize the witness's testimony. *See generally*

---

7. General Laws 1956 § 12–17–15 provides, in relevant part:
"Whenever a witness, including a child as defined in § 14–1–3, refuses, on the basis of his or her privilege against self-incrimination, to answer a question or to produce other evidence of any kind in a criminal proceeding before any court or grand jury of this state, *the attorney general may*, in writing, request the presiding justice of the superior court or the chief judge of the family court or the district court to order the witness to answer the question or produce the evidence. The court, in its discretion, after notice to the witness, may order the witness to answer the question or produce the evidence." (Emphasis added.)

*Ferrell,* 889 A.2d at 187 n. 4. We are not confronted with a case in which the prosecution elected not to seek immunity for a witness in order to obtain an unfair advantage at the expense of defendant's right to confront his accusers. *See United States v. Ebbers,* 458 F.3d 110, 118, 119, 120 (2nd Cir.2006) (where defendant alleged a "discriminatory use" of immunity by the government). This record amply demonstrates the state's consistent and good-faith efforts to secure Bogan's attendance by seeking immunity and repeatedly requesting that Bogan be ordered to comply with the subpoena.

Significantly, although there was a suggestion that Bogan might change his testimony and refuse to incriminate Ramirez, the state nonetheless proceeded with an immunity petition intending to compel his testimony. These facts undermine defendant's contention that the state sought to avoid calling Bogan to the stand so that it could introduce his previous testimony. The fact that Bogan remained steadfast in his refusal to testify (and therefore remained unavailable) is not the state's fault. His previous testimony properly was admitted when he was declared unavailable; the fact that he reappeared later does not alter that result. We deem this issue without merit.

## II

### Refusal to Allow Bogan to Testify

The defendant next argues that the trial justice erred in refusing to allow him to call Bogan as a defense witness notwithstanding his Fifth Amendment privilege. The trial justice would not allow Bogan to be called before the jury in order to invoke his Fifth Amendment privilege. Defense counsel argued that although Bogan vowed to invoke his privilege "to each and every question I asked of him," he insisted that "there are some questions I can ask which

don't need the Fifth Amendment" and further, that defendant had a right to call Bogan "even if he pleads the Fifth Amendment to certain questions before the jury." Counsel is mistaken.

▆▆▆▆ We need not dwell long on this issue because the trial justice properly found that Bogan was unavailable as a matter of law. When a witness refuses to testify and invokes a legitimate Fifth Amendment privilege, the Sixth Amendment Confrontation Clause no longer applies because the witness is unavailable. *California v. Green,* 399 U.S. 149, 167–68, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970). A defendant's "Sixth Amendment right to the compulsory process does not trump [a witness's] Fifth Amendment right against self-incrimination." *United States v. Mabrook,* 301 F.3d 503, 506 (7th Cir.2002). Thus, after Bogan reappeared, the trial justice did not err in precluding defendant from calling him as a witness. In *Ducharme,* 601 A.2d at 944–45, we held that a trial justice may prohibit a witness from taking the stand if the witness is likely to invoke the Fifth Amendment before the jury. There is no indication in the record that Bogan had changed his position or had become willing to testify. In fact, defendant admitted that without immunity the court would be "placed in a position where if we have to call him, all we are going to hear from the witness, [is] 'I plead the Fifth Amendment.'"

In this case, the trial justice found that the witness had a legitimate privilege not to testify and defendant does not dispute this finding. Although the witness was unavailable to Ramirez, this was not the fault of the state and does not have an impact on defendant's Sixth Amendment Confrontation rights. Accordingly, we reject this argument.

## III

### Declaration of a Decedent
### Made in Good Faith

■ The defendant next argues that the trial justice erred in allowing Limburg to testify about Sargent's disclosure "[t]hat he was an informant." He allowed this testimony under Rule 804(c), a declaration of decedent made in good faith. Rule 804(c) provides:

"A declaration of a deceased person shall not be inadmissible in evidence as hearsay if the court finds that it was made in good faith before the commencement of the action and upon the personal knowledge of the declarant."

■ The admissibility *vel non* of an out-of-court statement as an exception to the rule against hearsay is a decision left to the sound discretion of the trial justice, whose decision shall not be disturbed unless it reflects a clear abuse of discretion. *State v. Lynch,* 854 A.2d 1022, 1031 (R.I. 2004).

We recently reviewed the Rule 804(c) exception and its relationship to the Confrontation Clause in *State v. Feliciano,* 901 A.2d 631 (R.I.2006), in light of the Supreme Court's decisions in *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) and *Davis v. Washington,* 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006). We have held that when a trial justice is called upon to evaluate an out-of-court statement under Rule 804(c), he or she must undertake a multistep analysis to determine whether the statement was "made *in good faith* before the commencement of the action and upon the personal knowledge of the declarant." *Norton v. Courtemanche,* 798 A.2d 925, 930 (R.I.2002) (quoting *Waldman v. Shipyard Marina, Inc.,* 102 R.I. 366, 368, 230 A.2d 841, 843 (1967)). Additionally, the trial justice must discern, under an objective standard, whether "the attendant circumstances display the earmarks of a 'testimonial' statement." *Feliciano,* 901 A.2d at 641. If the statement is found to be testimonial, the inquiry ends and the evidence must be excluded. *Id.* On the other hand, if the statement is found to be nontestimonial, it also must manifest an "indicia of reliability." *Id.*

Here, defendant argues that Sargent's declaration that he was an informant was not made in good faith because it was "completely self-serving." He additionally argues that because Sargent told Limburg that he was working for the State Police and the evidence suggested that he worked for the Woonsocket police, the statement was not reliable. On the evidence before him, the trial justice found that "Sargent had no reason to lie" to Limburg and rejected defendant's argument that the evidence should be excluded. We discern no abuse of discretion in this ruling.

■ The defendant also argues that the statement was testimonial and had no residual indicia of reliability, thus failing to satisfy Rule 804(c). A statement is testimonial if it is "a solemn declaration or affirmation made for the purpose of establishing or proving some fact." *Davis,* 126 S.Ct. at 2274 (quoting *Crawford,* 541 U.S. at 51, 124 S.Ct. 1354). Thus, "[a]n accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not." *Id.* (quoting *Crawford,* 541 U.S. at 51, 124 S.Ct. 1354). In the case before us, Sargent's statement to Limburg was a casual remark from one associate to another and not related to any official inquiry or proceeding. When Limburg arrived at Sargent's home, the decedent was engaged in a telephone conversation; Limburg asked about the caller and Sargent responded that it was the police and that he was an informant. There is no

suggestion that Sargent spoke under the belief that his statement to Limburg would be used at a later trial (particularly the trial of his alleged killer), nor was it made for the purpose of proving a fact or a motive for his subsequent execution-style murder. *See Crawford*, 541 U.S. at 51–52, 124 S.Ct. 1354 (classifying statements made for use at trial as testimonial). This evidence, as in *Feliciano*, was a statement of a decedent made to a friend and constituted a casual remark between acquaintances, and not a testimonial declaration.

Finally, defendant contends that since Sargent told Limburg he was an informant for the State Police, and other proof suggested he was an informant for the Woonsocket police, the statement is unreliable and thus inadmissible under Rule 804(c). We held in *Feliciano*, 901 A.2d at 642, that when the subject matter of a statement is of a serious nature, a "particularized guarantee[] of trustworthiness" exists to meet our reliability requirement. In the circumstances of this case, it is difficult to imagine a more serious declaration than an individual's admission that he or she is a police informant. We hold, based on the facts before us, that Sargent's statement to Limburg, while touching upon a serious topic, was not testimonial and possessed the necessary guarantee of trustworthiness to satisfy the requirements of Rule 804(c).

Moreover, even if the statement was admitted erroneously, its admission would constitute harmless error. When evaluating improperly admitted evidence, this Court reviews the remainder of the evidence introduced to discern whether the error was harmless beyond a reasonable doubt. *State v. Bettencourt*, 763 A.2d 636, 637 (R.I.2000). Viewing the abundant evidence in this case that supports the jury's verdict, we are satisfied that admitting the decedent's out-of-court statement amounts, at best, to harmless error.

## IV

### Motion to Pass

This Court reviews a trial justice's decision to deny a motion to pass the case under an abuse-of-discretion standard. *See State v. Usenia*, 599 A.2d 1026, 1032 (R.I.1991). "It is well settled that a decision to pass a case and declare a mistrial are matters left to the sound discretion of the trial justice." *State v. Suero*, 721 A.2d 426, 429 (R.I.1998) (citing *State v. Figueroa*, 673 A.2d 1084, 1091 (R.I.1996)). We frequently have held that from the vantage point at the front of the trial arena, the trial justice is best equipped to determine whether the challenged incident was so prejudicial that a mistrial was warranted. *Figueroa*, 673 A.2d at 1091. Thus, the refusal of the trial justice to pass a case is accorded great deference and will not be disturbed on appeal unless it is shown to be clearly wrong. *Id.*

The defendant contends that the trial justice erred when he denied a motion to pass the case based on potential juror bias. During deliberations, a juror asked the sheriff if the jury would "be all right when we return our verdict." Additionally, defendant alleges that his right to an impartial jury was violated when a juror overheard two sheriffs discussing the fact that they were directed to report to the trial justice's courtroom when the verdict was reached. The trial justice responded to these two incidents appropriately—he brought the jurors into the courtroom and instructed them that regardless of the verdict in the case, their safety and well-being was assured.

Given the number and variety of potentially prejudicial situations that arise during a trial, "due process does not require a new trial every time a juror has been placed in a potentially compromising

situation." *Smith v. Phillips*, 455 U.S. 209, 217, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982). The trial justice need not conduct a voir dire of the jury at every such instance to determine prejudice. *Id.* Nor does a rebuttable presumption of prejudice arise simply because the jury is made aware of information outside the trial record. *State v. Hartley*, 656 A.2d 954, 961–62 (R.I.1995). Instead, "the proper method of determining the prejudicial effect of extraneous information is to consider the probable effect that such information would have on an average reasonable juror." *Id.* at 962. Only if the trial justice concludes that the incident "would probably influence the decision of an average reasonable juror," should a mistrial be considered. *Id.*

In the case on appeal, the trial justice did not find that either incident gave rise to juror bias that would warrant a mistrial. Nevertheless, and out of an abundance of caution, he addressed the jury and satisfied himself that it would be "pure speculation" to assume that a juror's inquiry into her safety indicated a fear of rendering a guilty verdict. The trial justice also rejected defendant's contention that the sheriffs' remarks were prejudicial because it was the practice of the court to have additional court officers present when the verdict is taken in cases of a serious nature, with a sizeable gallery. The trial justice admonished the jurors to disregard anything they heard outside the courtroom and gave assurances about their safety. We deem this an adequate response to these minor incidents. It is our opinion that the trial justice did not abuse his discretion when he denied defendant's motion to pass the case and declare a mistrial.

## V

### The Habitual Offender Statute

The defendant also argues that he should not have been subject to an enhanced sentence as a habitual offender under § 12–19–21, the habitual offender statute. In pertinent part, § 12–19–21 states:

> "(a) If any person who has been previously convicted in this or any other state of two (2) or more felony offenses arising from separate and distinct incidents and sentenced on two (2) or more occasions to serve a term in prison is, after the convictions and sentences, convicted in this state of any offense punished by imprisonment for more than one year, that person shall be deemed a 'habitual criminal.' Upon conviction, the person deemed a habitual criminal shall be punished by imprisonment in the [A]dult [C]orrectional [I]nstitutions for a term not exceeding twenty-five (25) years, in addition to any sentence imposed for the offense of which he or she was last convicted. No conviction and sentence for which the person has subsequently received a pardon granted on the ground that he or she was innocent shall be considered a conviction and sentence for the purpose of determining whether the person is a habitual criminal."

The defendant argues that this statute was applied in an unconstitutional manner because the enhanced sentence he received was based on facts that were not found by the jury, as required by the Sixth Amendment jury trial guarantee. To support this argument, defendant contends that prior convictions are facts that must be found by a jury, in accordance with *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). In that case, the United States Supreme Court declared that *"[o]ther than the fact of a prior conviction,* any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury,

and proved beyond a reasonable doubt." *Id.* at 490, 120 S.Ct. 2348 (emphasis added). The defendant also argues that the prior-conviction exception to the jury-trial mandate for enhanced sentencing, as set forth in *Almendarez–Torres v. United States,* 523 U.S. 224, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998), is doomed precedent. We note at the outset that defendant failed to raise a Sixth Amendment challenge at the time of sentencing and thus, under our well-settled raise-or-waive rule, this issue is deemed waived. *State v. Russell,* 890 A.2d 453, 462 (R.I.2006). However, were this argument properly before us, it is without merit.

Under the statute, when an offender has two or more prior convictions, arising from separate incidents, for which he or she served a term in prison, and is convicted of any other felony offense, that person "shall be deemed a 'habitual criminal'" and "shall be punished by imprisonment in the [A]dult [C]orrectional [I]nstitutions for a term not exceeding twenty-five (25) years * * *." Section 12–19–21. The defendant contends that when a sentencing justice considers whether a prior conviction arises from a separate and distinct incident, he or she is engaging in a fact-finding exercise that is reserved for the jury. According to defendant, these facts must be pled in the indictment and presented to a jury to comply with the Sixth Amendment right to trial by jury. This argument is of no assistance to defendant.

■ Under the Sixth Amendment, only facts that were admitted by the accused or found by a jury may be used for sentencing enhancement. *See Blakely v. Washington,* 542 U.S. 296, 303, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004) (holding that pursuant to *Apprendi,* the maximum sentence a judge may impose is "*solely [dependant upon] the basis of the facts reflected in the jury verdict or admitted by the defen-* dant"). In *Apprendi,* 530 U.S. at 490, 120 S.Ct. 2348, the United States Supreme Court examined a New Jersey statute that allowed the Court to consider aggravating circumstances as sentencing enhancements. The Court held that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Id.* The Court again addressed this Sixth Amendment right to a jury trial in *Ring v. Arizona,* 536 U.S. 584, 609, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), in the context of death-penalty sentencing, and held that the defendant's right to a jury trial was violated when the sentencing judge considered aggravating factors that were not found by the jury. Because Arizona's enumerated sentencing enhancement "factors operate as 'the functional equivalent of an element of a greater offense,'" the Court held that the aggravating factors must be found by a jury. *Id.* In *Blakely,* 542 U.S. at 304–05, 124 S.Ct. 2531, the Court addressed sentencing enhancement guidelines used in Washington state courts and determined that the defendant's Sixth Amendment right to a trial by jury was violated when the sentencing justice imposed an enhanced sentence based on facts other than a prior conviction. The Court held that the enhanced sentence was improper because it was based on a "disputed finding that [defendant] had acted with 'deliberate cruelty.'" *Id.* at 313, 124 S.Ct. 2531. Unlike the case before us, the sentencing schemes evaluated in the *Apprendi* line of cases involved facts in addition to the fact of a prior conviction.

This Court previously has declared that the statute allows for an enhanced sentence in which facts, other than a judgment of conviction, are not in play. *See State v. Sitko,* 457 A.2d 260, 261 (R.I.1983)

(agreeing with defendant's contention that § 12–19–21 "does not establish a separate crime but constitutes a sentencing-enhancement measure"). Furthermore, notwithstanding defendant's prediction that it is doomed precedent, the Supreme Court has yet to disturb the holding established in *Almendarez-Torres,* that prior convictions need not be charged in the indictment or found by a jury beyond a reasonable doubt. *See generally Almendarez-Torres,* 523 U.S. at 228–48, 118 S.Ct. 1219 (defining the prior conviction exception). The Court in *Almendarez-Torres* distinguished between a sentencing factor and an element of the offense and decided that an element of a crime must be proven to a jury, but that prior convictions are not elements of a crime and may be utilized in sentencing enhancements. *Id.* Recently, in *Cunningham v. California,* — U.S. —, —, 127 S.Ct. 856, 868, 166 L.Ed.2d 856 (2007), the Court reiterated that prior convictions may be used for sentencing above the statutory maximum without triggering a Sixth Amendment violation. *See id.* at 860, 127 S.Ct. 856 ("As this Court's decisions instruct, the Federal Constitution's jury-trial guarantee proscribes a sentencing scheme that allows a judge to impose a sentence above the statutory maximum based on a fact, other than a prior conviction, not found by a jury or admitted by the defendant.").

The defendant argues that the prior-conviction exception set forth in *Almendarez-Torres* was repudiated by the *Apprendi* line of cases because, he contends, "all facts affecting sentencing must be found by a jury." His contention that the prior-conviction exception is threatened rests on his belief that a majority of the United States Supreme Court now views *Almen-*

*darez-Torres* with disfavor. We disagree. Although the holding in *Almendarez-Torres* has been criticized over the years in both dissenting and concurring opinions,[8] it has not been overruled and remains the law today. In fact, last term, in *James v. United States,* — U.S. —, 127 S.Ct. 1586, 167 L.Ed.2d 532 (2007), the Court acknowledged its holding "that prior convictions need not be treated as an element of the offense for Sixth Amendment purposes." *Id.* at 1600 n. 8 (citing *Almendarez-Torres* ). We agree with the holding by the Fifth Circuit Court of Appeals that "a majority of the Supreme Court has reaffirmed [its decision in] *Almendarez-Torres* in *James v. United States * * *.*" *United States v. Pineda-Arrellano,* 492 F.3d 624, 625 (5th Cir.2007).

We also note that other jurisdictions continue to hold that prior convictions, when used as sentencing enhancement factors, need not be submitted to the jury. *See, e.g., State v. Clemons,* 273 Kan. 328, 45 P.3d 384, 396 (2002) (juvenile adjudications fall under the prior-conviction exception to *Apprendi* ); *State v. Weldele,* 315 Mont. 452, 69 P.3d 1162, 1172 (2003) (holding that *Apprendi* does not require prior driving under the influence convictions to be given to the jury); *State v. Hurbenca,* 266 Neb. 853, 669 N.W.2d 668, 673 (2003) (finding in habitual offender sentencing, prior convictions need not go to jury); *State v. LeBaron,* 148 N.H. 226, 808 A.2d 541, 545 (2002) (in habitual offender sentencing, prior convictions need not be proved to jury beyond a reasonable doubt); *Commonwealth v. Aponte,* 579 Pa. 246, 855 A.2d 800, 810 (2004) (stating that "there is ample support for the conclusion that *Ap-*

---

**8.** *See, e.g., Rangel-Reyes v. United States,* — U.S. —, —, 126 S.Ct. 2873, 2874, 165 L.Ed.2d 910 (2006) (Thomas, J., dissenting); *Shepard v. United States,* 544 U.S. 13, 26, 125 S.Ct. 1254, 161 L.Ed.2d 205 (2005) (Thomas, J., concurring); *Apprendi v. New Jersey,* 530 U.S. 466, 520, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000) (Thomas, J., concurring).

*prendi's* prior conviction exception remains viable").

We agree with the Pennsylvania Supreme Court's holding in *Aponte*, 855 A.2d at 811, wherein a defendant's challenge to a sentencing enhancement statute on Sixth Amendment grounds was rejected. The statute challenged in *Aponte*, provided that upon proof of a prior conviction for a similar offense, the violator could be sentenced and fined up to twice the statutory maximum, without submitting the facts of the prior conviction to the jury. *Id.* at 802. The Pennsylvania Supreme Court held that "the existence of [the defendant's] convictions was capable of objective proof; there was no need to resubmit them for the jury to determine they were recorded in appellant's file." *Id.* at 812. The Court also held that "[t]he fact of a prior conviction stands alone; it does not require a presumption—it either exists as a matter of public record or it does not." *Id.* at 811; *see Commonwealth v. Allen*, 508 Pa. 114, 494 A.2d 1067, 1071 (1985) ("The existence of a prior conviction is a simple historical fact which may be ascertained through official documents.").

Additionally, defendant's suggestion that prior convictions must be proved to a jury is perplexing. A jury is a fact-finding body; requiring it to determine whether a judgment of the Superior Court is what it purports to be would extend beyond the fact-finding function and would in effect ask the jury to decide a question of law. This Court has held that a presumption of regularity attaches to final judgments of conviction. In *Ouimette v. State*, 785 A.2d 1132 (R.I.2001), an applicant for postconviction relief challenged a prior conviction that served to enhance a federal sentence pursuant to 18 U.S.C. § 3559(c)(2)(F). We held that the presumption of regularity that attaches to final judgments outweighs even the suggestion that a conviction may be invalid because there is no record to show the defendant did not knowingly and voluntarily enter a plea. *See Ouimette*, 785 A.2d at 1137 ("[W]e remain satisfied that, in collateral proceedings attacking the validity of a conviction used for purposes of sentence enhancement, the presumption of regularity attaches to a final judgment of conviction, notwithstanding the absence of a record."); *see also Parke v. Raley*, 506 U.S. 20, 29, 113 S.Ct. 517, 121 L.Ed.2d 391 (1992) (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464, 468, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938) (A presumption deeply routed in our jurisprudence is "the 'presumption of regularity' that attaches to final judgments, even when the question is waiver of constitutional rights.")).

Finally, we fail to see how a defendant, who enjoys the presumption of innocence, would benefit if his or her prior convictions were submitted to a jury responsible for determining his guilt or innocence. "If *Almendarez–Torres* were overruled based on *Apprendi*, prior felony crimes that could serve as the basis for sentence enhancements would have to be proven to a jury beyond a reasonable doubt. No defendant wants such an issue before the jury!" *Pineda–Arrellano*, 492 F.3d at 625–26. We agree. Although the defendant has presented a broad challenge to the prior-conviction exception to the *Apprendi* rule and urges the Court to declare that it no longer is operative precedent, we decline to do so. We are of the opinion that a prior judgment of conviction as reflected in a genuine court document is sufficient proof and need not be proved to a jury beyond a reasonable doubt.

## Conclusion

For the foregoing reasons, we affirm the judgment of the Superior Court to which we remand the papers in this case.